JAMES H. HARTNETT, SBN 84587
Hartnett, Smith & Associates
777 Marshall Street
Redwood City, CA 94063
Telephone: 650-568-2820
Telefax: 650-568-2823

Attorney for Defendant Donald Bohn

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARBARA MILLER, as guardian of Molly Miller, an individual; and ANNE MILLER, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>GREENSPRINGS BAPTIST CHRISTIAN FELLOWSHIP TRUST, et al.,<br><br>Defendants. | Case No. C 07-04776 JL<br><br>DECLARATION OF JAMES H. HARTNETT IN REPLY RE RULE 12(b)(6) MOTION<br><br>Date: February 27, 2008<br>Time: 9:30 a.m.<br>Courtroom: F, 15th Floor<br>Complaint filed: August 17, 2007<br>Trial date: None |

I, James H. Hartnett, declare:

1. I am an attorney at law licensed to practice in the State of California, and I am attorney of record for defendant Donald Bohn in this action. The facts stated in this declaration are true of my own knowledge, and I could and would competently testify to them if called as a witness.

2. Attached hereto as Exhibit "A" is a true and correct copy of a document purporting to be an unsigned and undated agreement between Grace Parish Christian Church and Maui Preparatory Academy. The agreement is structured as a land purchase agreement under which Grace Parish Christian Church is identified as the "Buyer" of

1

1  certain unimproved real property for the sum of $500,000. The agreement states that the
2  property was intended to be developed by Maui Preparatory Academy as a school.
3      3. The document attached as Exhibit "A" was produced by plaintiffs as part of their
4  Initial Disclosures pursuant to F.R.C.P. 26(a)(1), as a document that plaintiffs may use to
5  support their claims. The document was designated by plaintiffs as an "unsigned and
6  undated agreement."
7      I declare under penalty of perjury under California law that the foregoing is true.

Dated: February 13, 2008

_____
JAMES H. HARTNETT

# EXHIBIT A

THIS AGREEMENT is made and entered into this ____ day of _____, 2002, by and between Grace Parish Christian Church or its assign ("GP"), and Maui Preparatory Academy ("MPA"), collectively "the parties", with reference to the following facts:

A. MPA is a Hawaii nonprofit corporation within the meaning of Section 501(c)(3), Internal Revenue Code, and applicable state law. MPA as "Buyer" has entered into an agreement (the "Lease Option Agreement") with Peter as "Seller" to purchase a one-third undivided interest (the "MPA Property") in an unimproved fifteen-acre parcel of land (the "Total Parcel"), situated in the County of Maui, State of Hawaii. A copy of the Lease Option Agreement is hereto attached as Exhibit A. *(Note: Ascertain accurate name of Seller.)*

B. GP is a religious charitable organization within the meaning of Section 501 (c)(3) and Sections 509 (a) (1) and 170 (b)(A)(i), Internal Revenue Code, and applicable state Law. GP's charitable purpose for purchasing the remaining two-thirds undivided interest (the "GP Property") in the Total Parcel is to reserve the use of the GP Property for the charitable purposes and activities of the MPA Project.

C. The Land Purchase Agreement by and between GP as "Buyer" and Peter as "Seller," including the legal description of the GP Property and Total Parcel, is hereto attached as Exhibit B.

D. MPA desires to develop and operate the MPA Property together with the GP Property (i.e., the Total Parcel) as a children's school grades K through 12 or any grades thereof. Such development and use, including, without limitation, improvements and administration of classes and other community benefit activities, are hereinafter collectively called "MPA Project." All final permits and approvals from pertinent governing authorities for MPA to develop and operate the MPA Project on the Total Parcel are hereinafter called "all Final Approvals."

THEREFORE, the parties agree as follows:

## ARTICLE ONE

**MPA Agrees:**

1.1. At the time of this Agreement and continuing until MPA and GP become owners of record of their respective interests in the Total Parcel, MPA shall keep in full force and effect the terms and conditions of the Lease Option Agreement, including, without limitation, paying monthly rent (actual or deferred) on the Total Parcel.

1.2. At the time of this Agreement and continuing throughout MPA's operation of MPA Project and thereafter until the time (if any) that GP's clear title and interest in the GP Property is returned to GP or GP's assign (free of use and interest MPA and MPA Project), MPA shall pay in a timely manner, without any obligation or contribution of GP, all costs, expenses, damages and claims arising from MPA's development and use of the Total Parcel and MPA Project, including, without limitation, applications for all Final Approvals, improvements, insurance, principal and interest owed by MPA on the MPA Project, property taxes, bonds and assessements, secured and/or unsecured loans and obligations, utilities, maintenance, administration, attorney fees and accounting, materials, wages and fees, and any and all other ongoing obligations.

1.3. MPA is the subject of certain conditions and contingencies in the Land Purchase Agreement, including, without limitation, the terms and conditions thereof in Provision 23. MPA shall comply with such terms and conditions as though herein written.

2

12. **Time Periods: Satisfaction/Removal of Contingencies; Disapproval/Cancellation Rights:**
    A. **Time Periods:** The following time periods shall apply, unless otherwise agreed in writing:
       (1) Buyer has until the earlier of **60** business days prior to the close of escrow, or **30** business days from the date MPA receives all Final Permits and Approvals for MPA Project to complete all inspections, investigations, and review of documents and other applicable information, and to either disapprove in writing any items which are unacceptable to Buyer, or to remove the contingency associated with such disapproval right by the active or passive method (specified in Provision 11);
       (2) Seller shall have **21** business days from receipt of Buyer's written notice of items reasonably disapproved to respond in writing. If Seller refuses or is unable to repair or correct any items reasonably disapproved by Buyer, or does not respond within the strict time periods specified, Buyer shall have **15** business days after Seller's response, or after expiration of the time for Seller to respond, whichever occurs first, to cancel this Agreement in writing, or, alternatively, to purchase the Property subject to the exceptions;
       (3) Seller has **60** business days from acceptance to provide Buyer the reports and items specified in this Agreement.
       (4) Seller shall have **10** business days from the receipt of Buyer's notice of cancellation to deliver instructions in writing to Escrow Holder authorizing the return of the Entire Deposit back to Buyer.

13. **Seller's Risk; Buyer's Entire Deposit:** Consistent with the sum of the Entire Deposit, which is the sum of the total Purchase Price ($500,000.00), Buyer and Seller reasonably anticipate that Buyer shall purchase the property and minimize the risk to Seller that Buyer shall fail to close the escrow. Accordingly the parties agree that the following Provision 14 and Provision 15 equitably reflect such minimum risk to Seller and preserve Seller's rights in law or equity.

14. **Default – Liquidated Damages:** Upon the removal of all contingencies in this Agreement and/or the mutual ratification of any amendment hereto by Buyer and Seller, if Buyer fails to complete the purchase of the Property because of a default by Buyer, Seller may pursue any remedy in law or equity that it may have against Buyer on account of the default; provided, however, that by placing their initials in the spaces below,
    [X][ ] Buyer agrees [ ][ ] Seller agrees  [ ][ ] Buyer does not agree [ ][ ] Seller does not agree
    [X][ ] Buyer agrees [ ][ ] Seller agrees  [ ][ ] Buyer does not agree [ ][ ] Seller does not agree
    that:
    A. Buyer's Partial Deposit toward the purchase of the Property (described in Provision 1) shall not exceed Three Thousand Dollars ($3,000.00), and shall constitute total liquidated damages payable to Seller.
    B. The payment of such liquidated damages to Seller will constitute the exclusive remedy of Seller on account of any default by Buyer.
    C. Liquidated damages shall be payable to Seller solely out of Buyer's Partial Deposit and Seller warrants that upon Seller's receipt of Buyer's written notice to return Buyer's Additional Deposit of $497,000.00 (described in Provision 1) to Buyer, Seller shall not retain, claim, lien, or collect (execute levy for payment) against Seller's Additional Deposit or any interest therein, and Seller shall, within ten (10) business days of said notice, instruct Escrow Agent in writing to return the entire Additional Deposit to Buyer.
    D. Liquidated damages will be payable to Seller out of Buyer's Partial Deposit according to the following procedures:
       (1) Seller will give written notice in the manner prescribed by the applicable section of the Code of Civil Procedure for service in a small claims action to Escrow Agent and to Buyer that Buyer is in default under this Agreement and that Seller is demanding that the Escrow Agent remit the aforesaid Partial Deposit of $3,000.00 or any sum thereof to Seller as liquidated damages;
       (2) Buyer will have a period of 30 days from the date of receipt of Seller's notice and demand in which to give the Escrow Agent Buyer's objection;
       (3) If Buyer fails to give the Escrow Agent Buyer's objection within 30 days from the date of receipt of Seller's notice and demand: (a) Escrow Agent will promptly remit the amount demanded but not to exceed the amount of Buyer's Partial Deposit ($3,000.00) to Seller; and (b) Seller is released from any obligation to sell the property to Buyer;
       (4) If Buyer gives Escrow Agent Buyer's objection within 30 days from the date of receipt of Seller's notice

Buyer and Seller acknowledge receipt of this page, which constitutes Page 4 of 10 pages

Buyer's Initials [_____][_____]  Seller's Initials [_____][_____]

12. **Time Periods: Satisfaction/Removal of Contingencies; Disapproval/Cancellation Rights:**
    A. Time Periods: The following time periods shall apply, unless otherwise agreed in writing:
        (1) Buyer has until the earlier of <u>60</u> business days prior to the close of escrow, or <u>30</u> business days from the date MPA receives all Final Permits and Approvals for MPA Project to complete all inspections, investigations, and review of documents and other applicable information, and to either disapprove in writing any items which are unacceptable to Buyer, or to remove the contingency associated with such disapproval right by the active or passive method (specified in Provision 11);
        (2) Seller shall have <u>21</u> business days from receipt of Buyer's written notice of items reasonably disapproved to respond in writing. If Seller refuses or is unable to repair or correct any items reasonably disapproved by Buyer, or, does not respond within the strict time periods specified, Buyer shall have <u>15</u> business days after Seller's response, or after expiration of the time for Seller to respond, whichever occurs first, to cancel this Agreement in writing, or, alternatively, to purchase the Property subject to the exceptions;
        (3) Seller has <u>60</u> business days from acceptance to provide Buyer the reports and items specified in this Agreement.
        (4) Seller shall have <u>10</u> business days from the receipt of Buyer's notice of cancellation to deliver instructions in writing to Escrow Holder authorizing the return of the Entire Deposit back to Buyer.

13. **Seller's Risk; Buyer's Entire Deposit:** Consistent with the sum of the Entire Deposit, which is the sum of the total Purchase Price ($500,000.00), Buyer and Seller reasonably anticipate that Buyer shall purchase the property and minimize the risk to Seller that Buyer shall fail to close the escrow. Accordingly the parties agree that the following Provision 14 and Provision 15 equitably reflect such minimum risk to Seller and preserve Seller's rights in law or equity.

14. **Default – Liquidated Damages:** Upon the removal of all contingencies in this Agreement and/or the mutual ratification of any amendment hereto by Buyer and Seller, If Buyer fails to complete the purchase of the Property because of a default by Buyer, Seller may pursue any remedy in law or equity that it may have against Buyer on account of the default; provided, however, that by placing their initials in the spaces below,
    [X] [ ] Buyer agrees  [ ] [ ] Seller agrees  [ ] [ ] Buyer does not agree [ ] [ ] Seller does not agree
    [X] [ ] Buyer agrees  [ ] [ ] Seller agrees  [ ] [ ] Buyer does not agree [ ] [ ] Seller does not agree
    that:
    A. Buyer's Partial Deposit toward the purchase of the Property (described in Provision 1) shall not exceed Three Thousand Dollars ($3,000.00), and shall constitute total liquidated damages payable to Seller.
    B. The payment of such liquidated damages to Seller will constitute the exclusive remedy of Seller on account of any default by Buyer.
    C. Liquidated damages shall be payable to Seller solely out of Buyer's Partial Deposit and Seller warrants that upon Seller's receipt of Buyer's written notice to return Buyer's Additional Deposit of $497,000.00 (described in Provision 1) to Buyer, Seller shall not retain, claim, lien, or collect (execute levy for payment) against Seller's Additional Deposit or any interest therein, and Seller shall, within ten (10) business days of said notice, instruct Escrow Agent in writing to return the entire Additional Deposit to Buyer.
    D. Liquidated damages will be payable to Seller out of Buyer's Partial Deposit according to the following procedures:
        (1) Seller will give written notice in the manner prescribed by the applicable section of the Code of Civil Procedure for service in a small claims action to Escrow Agent and to Buyer that Buyer is in default under this Agreement and that Seller is demanding that the Escrow Agent remit the aforesaid Partial Deposit of $3,000.00 or any sum thereof to Seller as liquidated damages;
        (2) Buyer will have a period of 30 days from the date of receipt of Seller's notice and demand in which to give the Escrow Agent Buyer's objection;
        (3) If Buyer fails to give the Escrow Agent Buyer's objection within 30 days from the date of receipt of Seller's notice and demand: (a) Escrow Agent will promptly remit the amount demanded but not to exceed the amount of Buyer's Partial Deposit ($3,000.00) to Seller; and (b) Seller is released from any obligation to sell the property to Buyer;
        (4) If Buyer gives Escrow Agent Buyer's objection within 30 days from the date of receipt of Seller's notice

Buyer and Seller acknowledge receipt of this page, which constitutes Page 4 of 10 pages

Buyer's Initials [////] [_____] Seller's Initials [_____] [_____]

and demand, then the determination as to whether Seller is entitled to the disbursement of the Partial Deposit as liquidated damages, and every other cause of action that has arisen between Buyer and Seller under this Agreement, will be settled by arbitration in accordance with the conditions in Provision 15, ARBITRATION OF DISPUTES, or, if Seller disagrees to such arbitration, Seller shall take such action as Seller deems appropriate to recover such portion of the Partial Deposit as may be allowed by law, however, as hereinabove warranted by Seller, such action shall not include any claim or recovery against Buyer's Additional Deposit.

(5) If the determination as to whether Seller is entitled to disbursement of the deposit as liquidated damages is referred to arbitration, any fee to initiate arbitration will be paid by Seller, but the cost of arbitration will ultimately be borne as determined by the arbitrator.

15. **Arbitration and Disputes:** Any dispute or claim in law or equity arising out of this Agreement will be decided by neutral binding arbitration in accordance with the Hawaii Arbitration Act and not by court action except as provided by Hawaii law for formal review of arbitration proceedings. Judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction.

   NOTICE: By initialing the space below you are agreeing to have any dispute arising out of the matters included in the "Arbitration of Disputes" provision decided by neutral arbitration as provided by Hawaii law and you are giving up any rights you might possess to have the dispute litigated in a court or jury trial. By initialing in the space below you are giving up your judicial rights to discovery and appeal, unless those rights are specifically included in the "Arbitration and Disputes" provisions. If you refuse to submit to arbitration after agreeing to this provision, you may be compelled to arbitrate under the authority of the Hawaii Code of Civil Procedure. Your agreement to this arbitration provision is voluntary.

   We have read and understand the foregoing and agree to submit disputes arising out of the matters included in the "Arbitration of Disputes" provisions to neutral arbitration.

   Buyer's Initials [/MS][____] Seller's Initials [____][____]

16. **Cancellation of Sale/Escrow; Return of Deposits:** Pursuant to the provisions hereof and/or any conditions which may be mutually ratified by Buyer and Seller after acceptance, if Buyer elects to cancel the offer and receive back the Entire Deposit then a) Buyer and Seller shall mutually instruct Escrow Agent that on or before ten (10) business days from the date of Escrow Agent's receipt of Buyer's written instructions, Escrow Agent shall return the Entire Deposit to Buyer and/or to Buyer's assignee; b) Except as provided under Provisions 14 and 15, Seller shall not lien, attach, levy on, or otherwise encumber the Entire Deposit or instruct Title Company to hold all or any of the Entire Deposit in the Escrow in any manner inconsistent with Buyer's instructions to Seller and Escrow Agent, and at the time Buyer receives back the Entire Deposit, Buyer and Seller shall have no further obligations to each other under the Agreement.

17. **Tax Deferred Exchange of the Property.** In the event Seller wishes to enter into a tax deferred exchange for the Property, or Buyer wishes to enter into a tax deferred exchange with respect to property owned by them or in connection with this transaction, each of the parties agrees to cooperate with the other party in connection with such exchange, including the execution of such documents as may be reasonably necessary to complete the exchange provided that: (a) the other party will not be obligated to execute any note, contract, deed or other documents providing for any personal liability which would survive the exchange; and (b) the other party will not take title to any property other than the property described in this Agreement. The other party will be indemnified and held harmless against any liability which arises or is claimed to have arisen on account of the exchange.

18. **Buyer's Investigations:** Buyer's acceptance of the condition of the Property is a contingency of this Agreement. Buyer shall have the right to conduct inspections, investigations, tests and surveys, and other studies ("Inspections") at Buyer's expense. Buyer shall within the time period specified in Provision 12, complete these inspections and notify Seller of any items disapproved. Seller shall, at Seller's cost and at no cost to Buyer or Buyer's professionals, make the Property available for all inspections, which have not already by made by Seller to Buyer's satisfaction. As to these inspections, Buyer shall: (a) Keep the Property free and clear of liens; (b) Buyer shall repair all damages arising from the inspections; (c) Buyer shall carry, or shall require anyone acting

Buyer and Seller acknowledge receipt of this page, which constitutes Page 5 of 10 pages

Buyer's Initials [/MS][____] Seller's Initials [____][____]

on Buyer's behalf to carry, policies of liability, worker's compensation and other applicable insurance protecting Seller from injuries arising from the inspections conducted on the Property and the Total Parcel at Buyer's direction prior to close of escrow. Seller is advised that certain protections may be afforded Seller by recording a notice of non-responsibility for inspections made (work done) on the Property and the Total Parcel at Buyer's directions. Any governmental building or zoning inspector or governmental employee without the prior written consent of Seller may make no inspections, unless required by local law. Within sixty (60) days from Buyer's written request to Seller, Seller shall assist Buyer and/or MPA with investigations by providing Buyer and/or MPA with any and all written reports or other documents related to Buyer's investigation of the Property and the Total Parcel, including, but not limited to the following:

A. Lot Size:
B. Lines and Boundaries: Property lines and boundaries, septic and leach fields. (Fences, hedges, walls, and other natural or constructed barriers or markers do not necessarily identify true Property boundaries. The Total Parcel may be identified by survey mentioned in Provision 3-I and 3-J.
C. Zoning and Land Use: Inquiries, investigations, studies or any other means, past, present, or proposed laws, ordinances, referendums, initiatives, votes, applications and permits affecting the current use of the Property and MPA's intended use of the Total Parcel (MPA Project), zoning, building, size, governmental permits and inspections.
D. Utilities and Services: Availability, costs, and restrictions of utilities and services.
E. Environmental Hazards: Potential hazards including but not limited to hazardous waste, fuel or chemical tanks, and other materials, substances, products or conditions.
F. Protected Species or Properties: Presence of endangered, threatened, "candidate" species or wetlands on the Total Parcel.
G. Geological Conditions: Geologic/Seismic conditions, soil and terrain stability, suitability and drainage.
H. Rent and Occupancy Control: Some cities and counties impose restrictions which may limit the amount of rent that can be lawfully charged, and/or the maximum number of persons who can lawfully occupy the Property.

19. Project Reports and Drawings: Upon written request of Buyer, Seller shall provide Buyer and/or MPA with the following known material disclosures and information within the time specified in Provision 12. Buyer shall then, within the time specified in Provision 12, investigate the disclosures and information, and provide written notice to Seller of any item disapproved:
A. Geologic, Earthquake and Seismic Hazard Zones Disclosure
B. Special Flood Areas
C. State Fires Responsibility Areas
D. Mello-Roos
E. Common Interest Subdivision
F. Subject to Restrictions for Agricultural Use
G. Total Parcel is in, or adjacent to, an area with Right to Farm Rights
H. Encroachments, easements, or similar matters that may affect the Total Parcel
I. Any lawsuits by or against Seller threatening to or affecting the Total Parcel, including any lawsuits alleging a defect or deficiency of the Total Parcel.
J. Soil Problems
K. Zoning Violations: unconforming uses, setback violations
L. Copies of all soil and hydrology reports, environmental or toxic material reports, engineering reports, septic system reports, traffic studies, environmental impact studies, civil, architectural, structural, electrical, mechanical-plumbing, infrastructure, and landscape working drawings, specifications, architectural renderings or models or any other plans developed or prepared for the Property and the Total Parcel in Seller's possession or control located by Seller.
M. The names of any engineers, architects, draftsmen and/or other consultants known to Seller who have information concerning the Property and/or Total Parcel. Buyer is authorized to contact, discuss with and, if desired, retain said consultants, engineers, draftsmen and architects at Buyer's expense.

20. Ongoing Information: Seller agrees to voluntarily provide Buyer with any and all new documents or other items affecting the Property and the Total Parcel on an ongoing basis until the Close of Escrow.

Buyer and Seller acknowledge receipt of this page, which constitutes Page 6 of 10 pages

Buyer's Initials [LN] [____] Seller's Initials [____] [____]

21. **Seller's Representations and Warranties:** Seller hereby warrants and represents, to the best of Seller's knowledge, for the benefit of Buyer and its assigns, the following, both as of the date hereof and as of the date of the close of escrow:

   A. The Property and the Total Parcel are without physical defects, or encroachments upon same, and neither the Property or the operation thereof violate in any way any laws, regulations, or building codes, except (see addendum hereto attached if applicable). If Seller receives notice, or is made aware of any such violations prior to close of escrow, Seller shall immediately notify Buyer in writing. (Buyer shall within the time specified in Provision 12, investigate the disclosures and information, and provide written notice to Seller of any item disapproved.)

   B. There are not presently pending any special assessments or condemnation actions against the Property or any portion thereof, nor has Seller received any notice of any special assessments or condemnation action being contemplated. There is no litigation or other proceeding pending or threatened, which would affect the Property or its operation.

   C. The Property does not contain any hazardous or toxic materials, including, but not limited to, any chemicals or materials regulated as hazardous or toxic under any federal, state or local law, including, without limitation, petroleum or PCB's, and the Property does not have located under it any underground storage tanks. In addition, no such hazardous or toxic materials have ever migrated from the Property to any other property. Seller agrees too provide Buyer promptly in writing any information which Seller has or may acquire regarding the presence and location of any hazardous or toxic materials or underground storage tanks on or about the Property.

   D. Seller knows of no facts to prevent Buyer and/or MPA from applying to governmental authorities for all Final Approvals to operate the Property and the Total Parcel as MPA Project, and/or in the normal manner in which similar properties in the area are operated. Seller shall at all times cooperate with MPA and/or governing authorities to assist MPA to develop the MPA Project.

   E. Seller agrees to indemnify, protect, defend and hold Buyer, including the Entire Deposit (described in Provision 1), harmless from and against any and all liabilities, damages, losses, causes of action, claims, costs and/or other expenses (including, without limitation, attorney's fees, experts' fees, costs and court fees) arising from or incurred in connection with any breach of any of the foregoing representations and warranties, or from any false information provided by Seller or from any material information known to Seller which Seller has failed to disclose. This indemnity shall survive the close of escrow.

   F. Seller agrees, at its sole cost and expense, to manage, maintain, and continue its obligations to improve the Property and Total Parcel including utilities and infrastructure as necessary to assist MPA's applications (including appeals) for all Final Approvals, including, without limitation, variances, building permits, and/or other permits to develop and operate MPA Project on the Total Parcel. Seller shall continue to cooperate with the governing authorities as necessary to assist MPA to develop the MPA Project.

   G. During the term of this Agreement, Seller shall not market the Property and/or the Total Parcel nor provide financial information or due diligence materials to any third party, excepting MAP, not mutually agreed upon in writing between Buyer and Seller.

   H. As of the close of escrow, there will be no outstanding contracts made by Seller for any improvements to the Property and the Total Parcel which have not been fully paid by Seller, and Seller shall cause to be discharged all mechanic's liens, arising from any labor and materials furnished prior to the close of escrow.

   I. Until possession is delivered to Buyer, Seller agrees to keep the Property in not less than the same manner and condition than on the date of mutual ratification of this Agreement. All debris and personal property not included in the sale shall be removed. Buyer has the right and is advised to inspect the Property prior to close of escrow to insure that it has been so maintained.

   J. The Agreement and all documents delivered by Seller to Buyer, now or at close of escrow, are complete sets of originals, or true and correct copies thereof and have been or will be duly authorized and executed and delivered by Seller, and are legal, valid and binding obligations of Seller, sufficient to convey clear transferable title, and enforceable.

   K. All representations and warranties contained in this Agreement or implied by law shall be deemed to survive the Close of Escrow and shall not merge with the deed.

22. **Subsequent Disclosures:** In the event Seller, prior to close of escrow, becomes aware of adverse conditions materially affecting the Property, or any use thereof, or any material inaccuracy in disclosure, information, or

Buyer and Seller acknowledge receipt of this page, which constitutes Page 7 of 10 pages

Buyer's Initials [DM] [____]   Seller's Initials [____] [____]

representations previously provided to Buyer. Seller shall promptly provide a written supplemental or amended disclosure covering those items. Buyer shall within the time specified in Provision 12 provide written notice of any items reasonably disapproved.

23. **Contingencies; Buyer and MPA:** The offer and Buyer's obligations under this Agreement are subject to Buyer's approval or waiver of the conditions specified in this Provision. Buyer's failure to approve or otherwise waive these conditions shall be conclusively deemed as Buyer's disapproval, whereby upon Seller's receipt of Buyer's written instructions, Seller and Buyer shall each deliver their respective instructions to Escrow Agent authorizing the return of the Entire Deposit back to Buyer without any further obligation on the part of either Buyer or Seller hereunder, or, alternatively, Buyer may purchase the Property subject to the conditions:
   A. On or before twenty-eight (28) months from acceptance MPA shall receive all Final Approvals from pertinent governmental agencies.
   B. Beginning the time of acceptance and continuing during the said 28-month period: (1) MPA shall be able to demonstrate financing and ability to begin construction of MPA Project on or before ten (10) days from the date of all Final Approvals; (2) MPA shall be able to demonstrate to Buyer's satisfaction that MPA Project shall be successfully completed within 2 years from the time of all Final Approvals; (3) Seller and/or MPA shall not default, cancel or otherwise fail to keep in force and effect a Lease Option Agreement or other agreement by and between Seller and MPA whereby Seller agrees to sell and MPA agrees to purchase the MPA Five-Acre Interest for the exclusive use of the MPA Project; (4) MPA shall not default or otherwise fail to make timely monthly cash rent payments and/or monthly-deferred rent payments on the Total Parcel as agreed by Seller and MPA; (5) MPA shall not default or otherwise fail to make timely payments of fees, costs and expenses arising from MPA's applications for all Final Approvals and all other expenses incurred by MPA related to the Total Parcel; (6) MPA shall notify the appropriate governmental agencies that MPA shall assume responsibility to pay all the assessments charged against the Property together with the MPA Five-Acre Interest (the Total Parcel) albeit the Property is titled in Buyer; (7) MPA shall purchase and keep in full force and effect all insurance policies covering MPA's use of the Total Parcel (including applications for all Final Approvals) naming Buyer as additionally insured; (8) At no cost to Buyer, MPA shall purchase and keep in full force and effect insurance policies naming Buyer as additionally insured and shall otherwise indemnify, protect, defend and hold Buyer and harmless from and against any and all liabilities, damages, losses, causes of action, claims, costs and/or other expenses (including, without limitation, attorney's fees, experts' fees, costs and court fees) arising from MPA's application for all Final Approvals for the MPA Project and MPA's use of Total Parcel; (9) MPA shall pay, as requested by Buyer, Buyer's expenses arising from this Agreement, unless Seller has agreed in writing to make specific payments (e.g., Buyer's payments under Provision 1); (10) Upon request(s) of Buyer, MPA shall demonstrate to Buyer that MPA Project shall be successfully completed within 2 years from the time of all Final Approvals; (11) MPA shall not subordinate or otherwise encumber the Property to secure any note or loan; (12) upon request of Buyer, MPA shall notice Buyer of any survey reports, engineering plans, studies, analyses, and reports relating to MPA Project and the Total Parcel which MPA has requested but has not received from Seller; (13) MPA shall cooperate with Buyer or Buyer's agent to conduct Buyer's investigations with respect to the Total Parcel, and (14) MPA shall continue to qualify as an exempt charitable organization in good standing within the meaning of 501(c)(3), Internal Revenue Code and applicable state law.

24. **Attorney Fees:** In any action or proceeding involving a dispute between Buyer and Seller arising out of the execution of this Agreement or the sale, whether for tort or for breach of contract, and whether or not brought to trial or final judgment, the prevailing party will be entitled to receive from the other party a reasonable attorney fee to be determined by the court of arbitrators.

25. **Brokers:** No broker or other party has a claim for brokerage commission, finder's fees, or like payment arising out of or in connection with Buyer's purchase of the Property. Seller hereby agrees to indemnify, defend, protect and hold Buyer harmless from and against any liability, cause of action, loss, costs, damage and/or expense, including, without limitation, attorney's fees and costs and court costs arising out of or incurred in connection with any claim by any broker or finder, hired by or otherwise providing services for Seller in connection with Seller's sale of the Property to Buyer.

Buyer and Seller acknowledge receipt of this page, which constitutes Page 8 of 10 pages

Buyer's Initials [____] [____]   Seller's Initials [____] [____]



26. **Assignment:** Buyer's rights hereunder may be assigned to a partnership, corporation, trust, or other party and any such transferee shall have all the benefits, including rights to specific performances, damages, and enforcement of Seller's representations and warranties that Buyer has under this Agreement.

27. **Foreign Investor Disclosure:** Neither Buyer nor Seller are nonresident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (collectively "foreign person") as those terms are defined within the meaning of Section 1445 of the Internal Revenue Code of 1986 and other tax regulations, or similar Hawaii laws or regulations. Buyer and Seller shall each sign under penalty of perjury and deliver to each other at the close of escrow a certification thereof indicating thereon each U.S. taxpayer identification number and address of Buyer and Seller.

28. **Closing:** Full Purchase Price to be paid and deed to be recorded on or before ten (10) days prior to the date of the close of escrow which dates shall be agreed upon by Buyer and Seller. Both parties will deposit with an authorized escrow officer, to be selected by Buyer, all funds and instruments necessary to complete the sale in accordance with the terms of this Agreement. The date of Close of Escrow shall be mutually decided by the parties and delivered by written instruction to Escrow Agent on or before ten (10) days business days prior to close of escrow.

29. **Survival:** The omission from escrow instructions of any provision in this Agreement will not waive the right of any party. All representations or warranties will survive the close of escrow.

30. **Expiration of Offer:** This offer will expire unless acceptance is delivered to Buyer on or before September 1, 2002 at 9 o'clock p.m.

31. **Counterparts:** This Agreement may be executed in one or more counterparts, each of which is deemed to be an original.

32. **Facsimile Counterparts Approved:** This Agreement may be executed in any number of separate counterparts, and exchanged via facsimile by and between the parties, each copy of which shall be deemed an original, and all of which taken together shall constitute a single instrument.

33. **Time:** Time is of the essence of this Agreement; provided, however, that if either party fails to comply with any contingency in the Agreement within the time limit specified, this Agreement will not terminate until the other party delivers written notice to the defaulting party requiring compliance within 48 hours after receipt of notice. If the party receiving the notice fails to comply within the 48 hours, the non-defaulting party may terminate this Agreement without further notice.

34. **Conditions Satisfied/Waived in Writing:** Each condition or contingency, covenant, approval or disapproval will be satisfied according to its terms or waived by written notice delivered to the other party.

35. **Entire Agreement/Assignment Permitted:** This document contains the entire agreement of the parties and supersedes all prior agreements or representations with respect to the Property which are not expressly set forth. This Agreement may be modified only in writing signed and dated by both parties. Both parties acknowledge that they have not relied on any statements of real estate Agent or Broker, if any, which are not expressed in this Agreement. Buyer may assign any right under this Agreement to any nonprofit charitable organization determined exempt within the meaning of Section 501(c)(3) of the Internal Revenue Code, including but not limited to MPA, without the written consent of Seller.

36. **Addenda:** The following addenda are attached and made a part of this Agreement.

[ ] _____
[ ] _____
[ ] _____

Buyer and Seller acknowledge receipt of this page, which constitutes Page 9 of 10 pages

Buyer's Initials [ JM ] [ ____ ]    Seller's Initials [ ____ ] [ ____ ]

The undersigned officer of Buyer, acknowledges that he has the power to execute this Agreement on behalf and for the Buyer and that he thoroughly read and approved each of the provisions contained herein and agrees to purchase the Property for the price and on the terms and conditions specified. Buyer acknowledges receipt of a copy of this offer.

Buyer_____Date_____ Time __2 P.M.__
         John Wyss, President

## ACCEPTANCE

Seller accepts the above Offer and agrees to sell the Property for the Purchase Price and on the terms and conditions specified.

Seller acknowledges receipt of a copy of this Agreement. Authorization is hereby given to the Broker(s) in this transaction if any, to deliver a signed copy to Buyer and/or MPA and to disclose the terms of sale to the Broker at close of escrow.

37. IF CHECKED [ ] ACCEPTANCE IS SUBJECT TO ATTACHED COUNTER OFFER DATED: _____, 2002

Seller_____Date_____ Time_____
              (Signature)

Seller_____
              (Please print name)

Seller_____Date_____ Time_____
              (Signature)

Seller_____
              (Please print name)

Buyer and Seller acknowledge receipt of this page, which constitutes Page 10 of 10 pages

Buyer's Initials [_____] [_____]  Seller's Initials [_____] [_____]

1.4. Beginning the date the parties execute this Agreement and continuing until MPA receives all Final Approvals to develop and operate MPA Project, MPA shall remain financially solvent and qualified to purchase a one-third undivided interest in the Total Parcel (i.e., the MPA Property).

1.5. MPA shall at all times be aware of any condition, breach or incapacity which does prevent or may reasonably prevent MPA from full compliance with the terms and contingencies in this Agreement, including, without limitation, the terms and conditions in the attached Land Purchase Agreement and/or the Lease Option Agreement. MPA shall notify GP in writing within ten (10) business days from the date that MPA is aware of any such condition, breach or incapacity.

1.6. MPA shall not enter into any loan or other secured or unsecured obligation with any person or persons, corporate or private, which encumbers, directly or indirectly, the GP Property.

1.7. The Lease Option Agreement, by and between Peter and MPA, shall provide that any financial obligation thereof shall not encumber, or construe to encumber, the GP Property, including, without limitation, any deed of trust recorded in Official records as a lien against the MPA Property shall not encumber the GP Property.

1.8. As applicable to all fund raising and/or any other financial activities or obligations of MPA Project, MPA shall give proper notice to all interested parties that the GP Property shall at all times remain free of secured debt.

1.9. On or before ten (10) days from the date that GP notifies MPA of GP's cancellation of the Land Purchase Agreement, if requested by GP, MPA shall instruct the pertinent Escrow Agent to return the Entire Deposit (described in Provision I of the Land Purchase Agreement) of $500,000.00 cash and any interest paid in escrow (collectively "the Entire Deposit") to GP, free of any interest of MPA and/or MPA Project.

1.10. On or before ten (10) days from the date GP notifies MPA that the GP Property is no longer reserved for the use of MPA Project, MPA shall, at MPA's sole expense, prepare and record in Official records the proper instrument(s) to remove any deed restriction(s) that may be recorded against the GP Property. (see Deed Restriction below in Section 2.2).

1.11. MPA shall indemnify, protect, defend and hold GP and the GP Property, including the Entire Deposit, harmless from and against any and all liabilities, damages, losses, causes of action, claims, costs and/or other expenses (including, without limitation, attorney's fees, experts' fees, costs and court fees) arising from or incurred in connection with MPA's development and use of the Total Parcel and MPA Project.

The indemnification and hold harmless set forth in this Section shall attach to GP's cancellation of the Land Purchase Agreement (if any) and return of the Entire Deposit to GP, or, in the event MPA is unable to develop the Total Parcel and/or successfully operate MPA Project, to the return of GP's clear title and interest in the GP Property to GP or GP'assign free of use or interest of MPA or MPA Project.

1.12. MPA shall set aside an area of approximately 625 square feet (25' X 25') or more of the Total Parcel to be used as a place of nondenominational meditation, study or prayer.

(Note: On or before ninety (90) days from this Agreement, GP and MPA shall make and enter into an agreement setting forth the terms and conditions whereby a) the said area is reserved for the specific use of GP, the development of which may be partially paid by GP, or b) MPA shall pay to develop and maintain the area as part of the MPA Project to be used by MPA with limited use of GP. If GP and MPA agree that

3

MPA's partial use of the area is essential to the successful operation of the MPA Project, the agreement shall set forth the estimated times that the area shall be available to GP. The agreement shall provide that at all times the area include a plaque or other structure illustrating a written pledge, quote, poem, or other writing(s), as proposed by GP and agreed upon by MPA, emphasizing the ethical and moral standards of the MPA Project, and MPA may pay for such plaque or structure and/or some specific use of the area, including, without limitation, paying to clean, maintain and/or repair the area after GP's specific use thereof, however, MPA shall agree to pay all ongoing costs and expenses of the area as part of the expenses of the Total Parcel.)

1.13. MPA shall allow other community benefit organizations, including GP and other churches and charities, to conduct activities in certain areas of MPA Project, so long as such use is consistent with the successful operation and charitable purposes of MPA Project.

1.14. As consistent with law, all agreements, leases, service or employment contracts, or any other writings by and between MPA and any other person or persons who may use or provide ongoing services to the Total Parcel and MPA Project, shall include a discrimination clause including words to the effect:

**NONDISCRIMINATION.** In administering its affairs, including, without limitation, the terms and conditions of this _____, MPA shall not discriminate against any person on the basis of race, creed, color, national or ethnic origin, sexual orientation or age. Optional: [Subject] hereby acknowledges that to [Subject's] knowledge and belief, MPA has not discriminated against [Subject] or any agent, associate, and/or any other third person(s) of [Subject].

ARTICLE TWO

GP Agrees:

2.1. On or before sixty (60) days before the Land Purchase Agreement between Peter and GP closes escrow, GP shall inform the Maui County Tax Assessor in writing that MPA and GP are both charitable organizations within the meaning of 501(c)(3) Internal Revenue Code and applicable Hawaii Corporation Code, and that GP's sole purpose for purchasing a fifty per cent (50%) undivided interest in the Total Parcel is to reserve same to the charitable use and activities of MPA Project and of GP, and GP shall request a waiver of property taxes and other applicable assessments against the GP Property.

2.2 Pursuant to a request of MPA and/or the requirement of any governing agency, GP shall record in Official records a form of deed restriction restricting the use of the GP Property to MPA Project until such time that GP or GP's assign receives back sole interest and use of the GP Property free of MPA and MPA Project. If for any reason MPA shall fail and/or be unable to operate MPA Project, GP shall instruct MPA to remove any and all said deed restrictions on the GP Property.

2.3. At any time after MPA is successfully operating the MPA Project, GP has the right and discretion to transfer the GP Property to MPA for MPA Project, free of interest of GP, however, nothing in any of the instruments, writings or activities of GP and MPA and/or the MPA Project shall ever be construed as an obligation against GP to make such transfer.

4

2.4. Prior to the close of escrow, provided the parties agree that their mutual interests are best served, GP may amend the Land Purchase Agreement to describe the GP Property as a specific, subdivided, ten-acre portion of the Total Parcel having access to paved street and utilities, rather than a two-thirds undivided interest in the Total Parcel.

2.5. GP and/or MPA shall instruct the Maui County Tax Assessor and other pertinent governing agencies to mail all bills for assessments and other expenses against the GP Property and Total Parcel to the address of record and/or accounts payable of MPA or MPA Project to be paid by MPA. (see "MPA agrees to pay costs and expenses" above in Section 1.2.).



# LAND PURCHASE AGREEMENT

Grace Parish Church and/or its assignee ("Buyer"), hereby offers to purchase for a price of Five Hundred Thousand and no/100 Dollars ($500,000.00) (the "Purchase Price") on the terms and conditions stated herein (the "Agreement"), the following real property located in the City of _____, County of Maui, State of Hawaii and more particularly described as follows:

A two-thirds undivided interest (the "Property") in an unimproved fifteen-acre parcel hereinafter called the "Total Parcel". The Total Parcel is generally known as "Parcel within Makila Land Development, makai of Lot 11." (The map showing the exact legal description of the Total Parcel shall follow in escrow.)

1. **Maui Preparatory Academy:** Maui Preparatory Academy (MPA) is a Hawaii nonprofit corporation within the meaning of Section 501(c)(3), Internal Revenue Code, and applicable state law. MPA has entered into a separate agreement with Seller to purchase the remaining one-third undivided interest (hereinafter "the MPA One-Third Interest") in the Total Parcel and to solely develop and operate same together with the Property (i.e., the Total Parcel) as a children's school grades K through 12 or any grades thereof. Such development and use, including, without limitation, improvements and administration of classes and of other community benefit activities, are collectively called "the MPA Project." All final permits and approvals from pertinent governing authorities for MPA to operate MPA Project on the Total Parcel shall be hereinafter referred to as "all Final Approvals."

2. **Buyer and MPA.** Buyer's purpose for purchasing the Property (subject to certain contingencies, including, without limitation, the contingencies set forth in this Agreement) is to reserve the Property for the charitable activities and purposes of MPA (the MPA Project).

3. **Financial Terms:**
   A. $ __3,000.00__ Partial Deposit evidenced by [X] personal check payable to First Hawaii Title Corporation ("Escrow Agent"), and placed in escrow and held uncashed until acceptance and not later than three (3) business days thereafter deposited with Escrow Agent toward the Purchase Price.
   B. $ __497,000.00__ Additional Deposit evidenced by [X] personal check payable to Escrow Agent and placed in escrow and held uncashed until acceptance and not later than (3) days business days thereafter deposited with Escrow Agent toward the Purchase Price. (The Partial Deposit and the Additional Deposit are hereinafter collectively called "the Entire Deposit.")
   C. $ None    Balance of Cash Payment
   D. $ None    Other Financing Terms
   E. $ None    Bonds or Assessments of Record if Assumed
   F. $ None    Other Financing Terms
   G. $ __500,000.00__ Total Purchase Price (not including closing costs)

4. **Allocation of Costs:** (check boxes which apply)
   A. [ ] Buyer, [X] Seller, to pay County transfer tax or transfer fee _____
   B. [ ] Buyer, [X] Seller, to pay City transfer tax or transfer fee _____
   C. [X] Buyer, [ ] Seller, to pay owner's title insurance policy _____
   D. [ ] Buyer, [ ] Seller, to pay Escrow Fee _____
   **Septic/Sewer/Well Costs** (If reports already exist, Seller shall submit copies to Buyer within time specified in Provision 12.)
   E. [ ] Buyer, [X] Seller, to pay for costs of testing the Total Parcel to determine the suitability of soil for sewage disposal (example: profile hole, Percolation test, leach lines, etc.)
   F. [ ] Buyer, [X] Seller, to pay for sewer connection, if required by law or by MPA prior to close of escrow
   G. [ ] Buyer, [X] Seller, to pay to have well installed, if required by law or by MPA prior to close of escrow
   **Other Costs** (If reports already exist, Seller shall submit copies to Buyer within time specified in Provision 12.)
   H. [ ] Buyer, [X] Seller, to pay for costs of reports identifying whether the Total Parcel is located within a Geological, Seismic, Flood or State Fire Responsibility Area.

Buyer and Seller acknowledge receipt of this page, which constitutes Page 1 of 10 pages

Buyer's Initials [ _JW_ ] [ _____ ]  Seller's Initials [ _____ ] [ _____ ]

I. [ ] Buyer, [X] Seller, to pay for costs for the Total Parcel to be surveyed by a licensed surveyor. The surveyor will set and flag all property lines and identify Total Parcel corners, to be approved in writing by Buyer prior to close of escrow. (If such survey has already been made, Seller shall submit copies of written report, plans, or other investigation information to Buyer within time specified in Provision 12.)

J. [ ] Buyer, [X] Seller, to pay for costs, if any, of identifying Total Parcel corners if not included in said survey.

K. [X] Buyer, [ ] Seller, except as specified in this Agreement, the parties shall pay all other costs associated with the transaction necessary to close escrow in accordance with the custom in which the Property is located.

5. **Escrow:** Escrow shall close as mutually instructed by Buyer and Seller but not later than thirty (30) business days after MPA receives from the pertinent governing authorities all the final approvals ("the Final Approvals") for MPA Project. This Agreement shall, to the extent feasible, constitute joint instructions to the Escrow Agent to consummate the transaction contemplated by the Agreement in accordance with the terms and provisions hereof; provided, however, that the parties shall execute such additional escrow instructions, not inconsistent with the provisions hereof, as may be deemed reasonably necessary to carry out the intentions of the parties as expressed herein. Escrow instructions consistent with this Agreement shall be signed by Buyer and Seller and delivered to the designated Escrow Agent, within [ ] days from acceptance, [ ] at least ____ days before the close of escrow, or [X] as mutually instructed by both parties. Escrow instructions may include matters required to close this transaction which are not covered by the Agreement. The omission from escrow instructions of any provision of this Agreement shall not constitute a waiver of the provision of the contractual rights or obligations of any party. Any change in the terms or provisions of this Agreement requires the mutual, written consent of Buyer and Seller. Buyer and seller hereby jointly instruct Escrow Agent that Buyer's deposits placed into escrow shall be held as a good faith deposit toward the completion of this transaction. Release of Buyer's funds will require mutual, signed release instructions from Buyer and Seller, judicial decision, or arbitration award.

6. **Title and Vesting:** Buyer shall be provided an updated preliminary title report and/or title insurance commitment for the Property from title insurer and within the time specified in Provision 12. Buyer shall either approve in writing the exceptions contained in above-said report or commitment or specify in writing any exceptions to which Buyer objects. Seller, at Seller's expense, shall use due diligence to remove any exception to which Buyer objects. If any such exception cannot be removed, Buyer may terminate this Agreement and Seller and Buyer shall deliver mutual instructions to Escrow Agent to return to Buyer the Entire Deposit, in which event, Buyer and Seller shall have no further obligations under this Agreement, or, alternatively, Buyer may purchase the Property subject to such exceptions. At close of escrow:
   A. Title to the Property shall be transferred by grant deed, and shall include oil, mineral, and water rights, if currently owned by Seller, unless otherwise agreed in writing.
   B. Title shall be free of liens, except as provided in this Agreement.
   C. Title shall be subject to all other encumbrances, easements, covenants, conditions, restrictions, rights and other matters, which are either:
      (1) Of record and shown in the preliminary title report, unless disapproved by Buyer within the time specified in Provision 12,
      (2) Disclosed to or discovered by Buyer prior to the close of escrow, unless disapproved in writing by Buyer within the time specified in Provision 12.
   D. Buyer shall be provided a standard coverage owner's policy.
   E. Title shall vest as designated in Buyer's escrow instructions.

7. **Title Insurance:** Seller shall convey to Buyer or such other person or entity as may be specified in Buyer's escrow instructions marketable fee title subject only to the items approved by Buyer in accordance with this Agreement. Title shall be insured by an owner's policy of title insurance issued by Escrow Agent in an amount equal to the Purchase Price with the premium for an owner's policy of title insurance to be paid by Buyer. Title will be conveyed by recording of a Grant Deed in the Official Records of the county identified above. Seller shall also execute and deliver to Buyer at closing a Bill of Sale and any other documents or instruments reasonably requested by Buyer and/or Escrow Agent, all in form and substance reasonably satisfactory to Buyer and Escrow Agent. Each party shall comply with the requirements of Escrow Agent in order to satisfy the terms and

Buyer and Seller acknowledge receipt of this page, which constitutes Page 2 of 10 pages

Buyer's Initials [___][___]  Seller's Initials [___][___]