1  James P. Cilley, Esq.  (SB#168118)
   Mark A. Schmuck, Esq.  (SB#205164)
2  **TEMMERMAN & CILLEY, LLP**
   2502 Stevens Creek Blvd.
3  San Jose, California 95128-1654
   Tel: (408) 998-9500
4  Fax: (408) 998-9700

5  Attorney for Plaintiffs

6

7

8                 UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11 BARBARA MILLER, individually and    )   Case Number: **C 07-4776 JL**
   as guardian ad litem of Molly Miller, an )
12 individual; ANNE MILLER, an          )   **FIRST AMENDED COMPLAINT FOR**
   individual; and ROBERT MILLER, an    )   **BREACH OF CONTRACT -**
13 individual,                          )   **PROMISSORY ESTOPPEL;**
                                        )   **CONVERSION; FRAUD; DECLARATORY**
14              Plaintiffs,             )   **RELIEF; IMPOSITION OF**
                                        )   **CONSTRUCTIVE TRUST; SPECIFIC**
15 v.                                   )   **PERFORMANCE; INTENTIONAL**
                                        )   **INTERFERENCE WITH RIGHT TO**
16 GREENSPRINGS BAPTIST                 )   **INHERIT; AND NEGLIGENT**
   CHRISTIAN FELLOWSHIP TRUST, a        )   **INTERFERENCE WITH RIGHT TO**
17 business entity of unknown form;     )   **INHERIT**
   CARLETON L. BRIGGS, an              )
18 individual; CHRISTINE DILLON, an     )
   individual; DONALD BOHN, an          )
19 individual; GRACE PARISH             )
   CHRISTIAN CHURCH, a business         )
20 entity of unknown form; and DOES 1   )
   through 50, inclusive,               )
21                                      )
22              Defendants.
   _____

23                    **I.**

24              **INTRODUCTION**

25      1.    This First Amended Complaint arises out of a conspiracy to defraud Decedent Elsie

26 Turchen, an octogenarian widow who had recently lost her only son, Ward Anderson, of over

27 $20,000,000 in real and personal property and an effort to conceal the conspiracy from the Plaintiffs

28 herein and from the intestate heirs of Elsie Turchen.  Defendants ingratiated themselves with Ms.

1  Turchen and became intimately familiar with her business and personal affairs.  Touting the non-
2  existent charitable and missionary works of a fictitious religious organization, the Defendants
3  convinced Elsie Turchen to execute deeds purporting to convey her property, as well as property
4  belonging to her son's estate, to the "Greensprings Fellowship Trust."

5      2.    The conspiracy included Defendant Christine Dillon assuming the name "Beth
6  Anderson," and holding herself out to the world as Elsie Turchen's granddaughter. After Elsie
7  Turchen died, Defendants concealed their fraudulent scheme from the Plaintiffs and Elsie Turchen's
8  real granddaughters - Elsie Turchen's only heirs - by falsely telling them that she was administering
9  the estate, and by making periodic "discretionary" distributions to them.

10     3.    Defendants surreptitiously collected and retained for themselves all rents on and
11 profits from the Anderson and Turchen properties; they sold at least two of those properties, then
12 used the funds to purchase property in other states for personal, rather than charitable uses.
13 Defendants also arranged to pay themselves management fees that total over $600,000 for
14 overseeing the swindled properties.

15     4.    Defendants further misrepresented to Plaintiffs that they would pay a gift that Elsie
16 Turchen had intended for her granddaughters, Anne and Molly Miller.  The representation that the
17 Defendants would pay the gift was made to cause the Plaintiffs to forego bringing an action against
18 the Defendants or the Estate of Elsie Turchen which would have involved increased scrutiny of the
19 Defendants' actions.  Knowing about Elsie's gift to Anne and Molly, Defendant Dillon represented
20 that Grace Parish Christian Church (which Plaintiffs are informed and believe never existed) would
21 pay $500,000 in place of a gift of a real property to a charity or charities of Robert's and Barbara's
22 choice on behalf of Anne and Molly.  Plaintiffs relied upon Dillon's representation that she was the
23 personal representative of the Estate of Elsie Turchen.  In reliance upon Dillon's representation that
24 she was the personal representative, and in reliance upon Dillon's representation that Grace Parish
25 Christian Church would pay the $500,000 gift, Plaintiffs did not make any claim, whatsoever,
26 against the Estate of Elsie Turchen because the gift was going to be, or had already been satisfied.
27 / / / /
28 / / / /

1

2

## II.

## PARTIES

3    5.    Plaintiff BARBARA MILLER is the guardian for her daughter, Molly Miller, a

4  minor, who is a resident of Kapalua, Maui, Hawaii.

5    6.    Plaintiff ANNE MILLER, is an individual whose residence is in Kapalua, Maui,

6  Hawaii.

7    7.    Plaintiff BARBARA MILLER is an individual whose residence is in Kapalua, Maui,

8  Hawaii.

9    8.    Plaintiff ROBERT MILLER is an individual whose residence is in Kapalua, Maui,

10  Hawaii.

11    9.    Plaintiffs are informed and believe that GREENSPRINGS BAPTIST FELLOWSHIP

12  TRUST ("Greensprings") is a business organization, form unknown.  Plaintiffs are informed and

13  believe and thereupon allege that Greensprings has its principal place of business at 407 South B

14  Street, San Mateo, California.  Plaintiffs are informed and believe that Greensprings is a 501(c)(3)

15  charitable organization.  Greensprings is not registered with the California Attorney General's

16  Registry of Charitable Trusts.  Plaintiffs are also informed and believe that Greensprings is the alter

17  ego of Defendants Dillon, Bohn and Briggs, or all of them, and in fact engages in no charitable

18  activities whatsoever.

19    10.    Plaintiffs are informed and believe and thereupon allege that at all times stated herein,

20  Defendant CARLTON L. BRIGGS ("Briggs") had his principal place of business at 3510 Unocal

21  Place, Suite 209, Santa Rosa, California.

22    11.    Plaintiffs are informed and believe and thereupon allege that at all times stated herein,

23  Defendant CHRISTINE MASERDOTTI DILLON was at all times relevant a resident of San Mateo

24  County, California.  Plaintiffs are informed and believe, and on that basis allege, that Defendant

25  Dillon has also falsely held herself out to be "Beth Anderson," the granddaughter of Elsie Turchen.

26    12.    Plaintiffs are informed and believe and thereupon allege that at all times stated herein,

27  Defendant DONALD BOHN at all times relevant did business in San Mateo County, California.

28    13.    Plaintiffs are informed and believe that  GRACE PARISH CHRISTIAN CHURCH

("Grace") is a business organization, form unknown.  Plaintiffs are also informed and believe that, although Defendants have represented Grace to be a 501(c)(3) charitable organization, the foregoing representation is false.  Grace is not registered with the California Attorney General's Registry of Charitable Trusts.  Plaintiffs are also informed and believe that Grace is the alter ego of Defendants Dillon, Bohn and Briggs, or all of them, and in fact engages in no charitable activities whatsoever.

14.    Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 THROUGH 50, and therefore sues these Defendants by such fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

15.    Plaintiffs are informed and believe that all Defendants, including those Defendants sued as fictitious Defendants, were at all times relevant herein, agents, servants, employees, joint venturers, and/or representatives of one another and acting within the course and scope of that agency, employment, and/or joint venture, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

## III.

## BACKGROUND FACTS

## CONSPIRACY TO MISAPPROPRIATE ELSIE TURCHEN'S ESTATE

16.    Ward Anderson was Elsie Turchen's son, and was her only child. Penny Anderson and her sister, Candace Anderson Jenkins, are the only living children of Ward D. Anderson, and there are no deceased children of Ward D. Anderson.

17.    Ward Anderson died on July 12, 1998 at the age of 64. His September 15, 1972 Last Will and Testament bequeathed his estate in trust  to Penny Anderson.  Ward Anderson's will named Elsie Tutchen the administrator of his estate. Elsie Turchen was 85 years old when her son died.  She never instituted probate proceedings after his death.

18.    Elsie Turchen died on December 10, 2000 at the age of 87. She was unmarried at the time of her death. Plaintiffs are informed and believe, and thereupon on that basis allege,

1  that Elsie Turchen left no last will and testament.

2      19.    Ward Anderson and Elsie Turchen owned numerous parcels of real property in

3  San Mateo County, California.  Those parcels were predominantly rental properties.  Plaintiffs

4  are informed and believe, and thereupon allege, that due to their intimate familiarity with the

5  Anderson and Turchen families' personal and business affairs, Defendants acquired knowledge

6  of the properties and thereafter, falsely created documents purporting to transfer title to these

7  properties to themselves and/or entities that they owned and/or controlled.

8      20.    Plaintiffs are informed and believe, and thereupon allege, that Defendant Dillon,

9  then known as Christine Maserdotti, introduced herself to Elsie Turchen about a decade before

10  Elsie Turchen died, at which time Elsie Turchen was approximately 75 years old. Plaintiffs are

11  informed and believes, and thereupon allege, that Dillon held herself out as a paralegal and

12  offered her paralegal services to Elsie Turchen, who thereafter employee Dillon's service in

13  preparing deeds and other documents for the Anderson/Turchen business. Plaintiff is informed

14  and believes, and on that basis alleges, that Defendant Dillon ingratiated herself with Elsie

15  Turchen by offering her friendship and companionship after Ward Anderson died, gaining the

16  confidence of Elsie Turchen, and became privy to information about the family's personal and

17  financial affairs, including but not limited to Ward Anderson's and Elsie Turchen's extensive real

18  property holdings. Plaintiffs are informed and believe, and thereupon allege, that Defendant

19  Dillon induced Elsie Turchen to execute multiple deeds on January 12, 1999, falsely

20  representing to Elsie Turchen that in so doing, Elsie Turchen would be making a charitable gift

21  to a religious organization.

22      21.    Plaintiffs are  informed and believe, and thereupon allege, that Defendants  in

23  furtherance of the conspiracy to divest the real property from its rightful owners, misrepresented

24  and/or misled Elsie Turchen into the belief that the real property she and her son had amassed

25  should be donated to a Christian charity such as Greensprings Fellowship Trust and

26  Greensprings Fellowship Church, Inc., both of which entities Defendants represented to Elsie

27  Turchen as being Internal Revenue Code compliant 501(c)(3) organizations engaged in good

28  works.

22.     Plaintiffs is informed and believe, and thereupon allege, that Elsie Turchen was induced by fraud and/or deceit to execute any and all deeds dated January 12, 1999. Specifically, Plaintiffs are informed and believe, and thereupon allege, that Defendants induced Elsie Turchen to execute the January 12, 1999 deeds by falsely representing to her that Greensprings Trust was a charitable organization. At the time the representations were made, the true facts were that (a) neither Greensprings Trust nor Greensprings Church then existed; **or** (b) no charitable work was being done by any Greensprings entity; and/or (c) Defendants were using the Greensprings name to obtain control over the Anderson and Turchen properties and the proceeds thereof for their own profit.

23.     Plaintiffs are informed and believe, and thereupon allege, that the following real properties were involved in the Defendants' scheme to defraud Elsie Turchen and her intestate heirs and the Plaintiffs:

773 El Cerrito Avenue, Hillsborough, California

12170 Skyline Boulevard, Woodside, California

789 El Camino Real, Burlingame, California

1507 Willow Avenue, Burlingame, California

501 N. El Camino Real, San Mateo, California

611 S. Eldorado, San Mateo, California

1449 Dakota Avenue, San Mateo, California

1441 Dakota, San Mateo, California

401 First Avenue, San Mateo, California

49 S. Railroad Avenue, San Mateo, California

620 First Avenue, San Mateo, California

400 South "B" Street, San Mateo, California

407 South "Be" Street, San Mateo, California

311 South Claremont, San Mateo, California

315 South Claremont, San Mateo, California

612-614 Tenth Avenue, San Mateo, California

1    1217 South Railroad Avenue, San Mateo, California

2    1301-1303 South Railroad Avenue, San Mateo, California

3    62 East 39th Avenue, San Mateo, California

4    143-147 South Boulevard, San Mateo, California

5    149-151 South Boulevard, San Mateo, California

6    69-75 21st Avenue, San Mateo, California

7    410 South B Street, San Mateo, California

8    4029 Beresford, San Mateo, California

9    2636 Broadway, Redwood City, California

10    307 South Claremont Street, San Mateo, California

11    1225 South "B" Street, San Mateo, California

12    325 Malcom Avenue, Belmont, California

13    811-813 South B Street, San Mateo, California

14    22 South Humboldt Street, San Mateo, California

15    1229 South B Street, San Mateo, California

16    Assessor's Parcel No. 067-250-040, Unincorporated San Mateo County, California

17    2025 Stratford Way, San Mateo, California

18    101 Elm Street, San Carlos, California (APN 045-314-130)

19    57 McLellan Avenue, San Mateo, California

20    1804 Maxine Avenue, San Mateo, California

21    20 South Eldorado Street, San Mateo, California

22    24.    One of the real properties listed above, commonly known as 325 Malcom Avenue,

23    Belmont, California, is the partial subject of this lawsuit.

24    25.    Plaintiffs are informed and believe, and thereupon allege, that on or about

25    November 20, 1995 Ward Anderson purported to deed the 325 Malcom Avenue property to

26    Elsie G. Turchen as trustee of the "Penny Trust." Plaintiffs are informed and believe, and

27    thereupon allege, that the Penny Trust never existed and that the November 20, 1995 deed,

28    itself, was insufficient to establish the Penny Trust.

26.    Plaintiffs are informed and believe, and thereupon allege, that a deed was recorded December 1, 2005, purporting to show a January 12, 1999 transfer of the 325 Malcom Avenue property from Elsie Turchen, as trustee of the "Penny Trust" to "Greensprings Fellowship Trust, a 501(c)(3) organization, Margaret Eberle, Trustee." For the reasons set forth below no transfer of the 325 Malcom Avenue property was or could have been made by that deed.

27.    Plaintiffs are informed and believe, and thereupon allege, that after Elsie Turchen died on December 10, 2000, Defendant Dillon falsely informed Dale J. Rizzo, Elsie Turchen's attending physician, that Dillon was Elsie Turchen's granddaughter "Beth Anderson." Plaintiffs are further informed and believe that Defendant Dillon continued to falsely hold herself out to be "Beth Anderson" until at least August 11, 2004. Plaintiffs are informed and believe, and thereupon allege, that Dillon made that misrepresentation to create the appearance that she was an heir of Elsie Turchen and in furtherance of Defendants' conspiracy to misappropriate all of the real and personal property of the Estate of Elsie Turchen.

28.    Plaintiffs are informed and believe, and thereupon allege, that on or before June 21, 2001, Defendants executed, notarized and/or caused to be recorded as instruments in the Official Records of San Mateo County documents, including, but not limited to Affidavits of Death of Trustee executed by Defendant Dillon in the name of "Beth M. Anderson" as "Successor Trustee" of several trusts and purported certifications of trust executed by Dillon in the false name of "Beth Anderson" and notarized by Defendant Bohn.  In those documents, Dillon swore under penalty of perjury as "Beth Anderson," that the trusts were valid and existing trusts, that she was the trustee of the trust, and that Elsie Turchen had the power to revoke the trust, all of which statements were false.  Plaintiffs are further informed and believe, and thereupon allege, that, in particular, Defendant Dillon lacked any personal knowledge that would have permitted her to certify the existence of the trusts, or that Elsie Turchen was either the trustor or original trustee of any such trusts.  Further, the statement that Elsie Turchen had the authority to revoke the trust was necessarily false, in that Elsie Turchen was then deceased. Plaintiffs are further informed and believe, and thereupon allege, that the sworn statement that

"Beth Anderson" was the current trustee of the trusts was false, in that the "Beth Anderson" referred to did not exist, and therefore could not have been appointed trustee of any trust of which either Elsie Turchen or Ward Anderson had been the trustor.

29.    Plaintiffs are informed and believe, and thereupon allege, that following the procurement, execution and recording of the Affidavits of Death of Trustee and Certification of Trusts referred to above, Defendants executed, notarized and/or caused to be recorded in the Official Records of San Mateo County, a Substitutions of Trustee, executed by Dillon in the false name of "Beth Anderson" and notarized by Defendant Bohn. In those Substitutions of Trustee, Dillon falsely represented that she was the present beneficiary of Deeds of Trust in favor of Elsie Turchen.

30.    Plaintiffs are informed and believe, and thereupon allege, that on or before November 14, 2001, Defendants executed, notarized and/or caused to be recorded as instruments in the Official Records of San Mateo County, Substitutions of Trustee and Full Reconveyances, executed by Dillon in the false name of "Beth Anderson" and notarized by Defendant Bohn.  In those documents, Dillon falsely represented that "Beth Anderson" was the trustee.  Plaintiffs are further informed and believe, and thereupon allege, that the Defendant executed the Substitutions of Trustee and Full Reconveyances in order to accomplish their misappropriation of proceeds of note payoffs secured by deeds of trust.

31.    Plaintiffs are informed and believe, and thereupon allege, that following Elsie Turchen's death, Defendant Dillon contacted Penny Anderson and Candace Anderson Jenkins, who were both living outside the state of California at the time, and told them that because both of them were suffering from mental health problems, Dillon had been appointed to administer the Estate of Elsie Turchen. That statement was false.

32.    Plaintiffs are informed and believe, and thereupon allege, that Dillon also told Penny Anderson and Candace Anderson Jenkins  that probating Elsie Turchen's estate would take time, but that Dillon was authorized, in her sole discretion, to disburse income from the estate. Plaintiffs are further informed and believe, and thereupon allege, that each of the calendar years 2002, 2003 and 2004, Penny Anderson received approximately $5,000 from Defendant

1  Dillon, and believed those funds to be distributions from Elsie Turchen's estate. Plaintiff is

2  further informed and believes, and thereupon alleges, that Dillon distributed approximately

3  $20,000 to Candace Anderson Jenkins during each of those years, and that in 2004, Dillon

4  purchased an automobile for Candace Anderson Jenkins.

5      33.    Plaintiffs are informed and believe, and thereupon allege, that beginning on or

6  about Beginning at or before the death of Ward Anderson and continuing to this day Defendants

7  have engaged in a scheme to misappropriate all of the assets of the estates of Ward Anderson

8  and Elsie Turchen, including, but not limited to: all rents on and proceeds of sale of the Estate

9  Properties; all bank and brokerage accounts of Elsie Turchen and Ward Anderson; and all their

10  personal property. As of the date of the filing of this amended Complaint, Defendants continue

11  to collaborate with one another in concealing the nature, scope and extent of their scheme,

12  including, but not limited to: the identities of all participants.

13      34.    Plaintiffs are informed and believe, and thereupon allege, that the principal victims

14  of the Defendants scheme to misappropriate all of the assets of Estates of Ward Anderson and

15  Elsie Turchen were Penny Anderson and her sister, Candace Anderson Jenkins, who, in the

16  absence of the Defendants' fraudulent scheme would have been the intestate heirs and entitled to

17  the vast majority of the properties subject to the Defendants' misappropriation scheme.

18      35.    Plaintiffs are informed and believe, and thereupon allege, that any deed executed

19  on January 12, 1999 and purporting to convey any real property to the Greensprings Trust was

20  ineffective to convey that property to Greensprings Trust, because: as of January 12, 1999, the

21  Greensprings Trust did not exist; and/or the January 12, 1999 deeds failed to name a

22  beneficiary. Furthermore, Plaintiffs are informed and believe, and thereupon allege, that

23  Margaret Eberle, the purported trustee of the Greensprings Trust named in the January 12, 1999

24  deeds, does not exist. Without an existing grantee, each of the January 12, 1999 deeds is a

25  nullity.

26      **CONSPIRACY TO PREVENT MILLER'S FROM ASSERTING CLAIM**

27      36.    Elsie Turchen was Molly Miller's natural great grandmother.  Molly is Robert and

28  Barbara Miller's adopted daughter.  Robert and Barbara also have a natural daughter, Anne.

Even though Molly was Elsie's blood relative, Elsie always treated both Molly and Anne equally as her own great grandchildren.

37.    Prior to her death, Elsie expressed in writing her intent to give a substantial gift to Anne and Molly.  Elsie's November 23, 2000 letter, written to Barbara and Robert Miller, stated, in pertinent part:

> "I would like to do something for your girls.  I do not shop; and I don't want to send things that have to be exchanged or are not useful, so I have failed to do anything on either Annie's or Molly's birthdays.
>
> > Would you consider the gift of the house for them?  Enclosed is the picture. . . .
>
> It will go vacant approximately 2/1/2001.
>
> As you know, I am very ill. . . ."

Elsie's clear intent was to give Anne and Molly the house located at 325 Malcolm Avenue, Belmont, California.  At the time she wrote this letter, Plaintiffs are informed and believe that Elsie thought she owned the Malcolm Avenue property, despite the deed purportedly transferring this property to the Greensprings Trust procured on January 12, 1999.  Elsie died on December 10, 2000.

38.    Following Elsie's death, Defendant Dillon also represented to Barbara Miller that she was the personal representative of the Estate of Elsie Turchen.  Defendant Dillon knew about Elsie's gift to Anne and Molly at the time Dillon made the representation to Barbara Miller because Dillon had a copy of Elsie's letter.  Knowing about Elsie's gift to Anne and Molly, Defendant Dillon entered into an agreement with Plaintiffs that Grace Parish Christian Church (which Plaintiffs are informed and believe never existed) would pay $500,000.00 (in place of a gift of the Malcolm Avenue property) to a charity or charities of Robert's and Barbara's choice on behalf of Anne and Molly.  Plaintiffs decided that it would be more efficient for the money to be paid directly to the chosen charity or charities rather than for Anne and Molly to receive the money directly, as intended by Elsie Turchen.  Plaintiffs are informed and believe that Defendant Dillon proposed to make this charitable payment so that Anne and Molly would not make any claim against the Turchen estate for payment of the gift directly to

1    Anne and Molly.

2        39.    On August 11, 2002, two checks totaling $500,000 were issued to "First Hawaiian

3    Title Company."  The checks were issued to a title company because the Millers' chosen

4    charity, the Maui Preparatory Academy, was in the process of purchasing real property for use

5    as a school and the $500,000 was paid towards that purchase.  The two checks were drawn on

6    an account in the name of "Real Estate Trust," which Plaintiffs are informed and believe is

7    owned by Defendant Greensprings.  These checks were signed by Defendant Bohn.  These

8    checks were intended to be performance on the agreement by Defendant Dillon (and now by

9    Defendant Greensprings) to fulfill Elsie Turchin's promise to make a gift to Anne and Molly as

10   indicated in Elsie's November 23, 2000 letter.  Plaintiffs received these checks believing that

11   Defendants were authorized to deliver payment consistent with the representations made by

12   Dillon.  Robert and Barbara Miller later learned that the checks were made out to First Hawaiian

13   Title Company and that such an entity did not exist.  On October 9, 2002, Mr. and Mrs. Miller

14   sent a letter to Defendants Bohn and Dillon and asked them to reissue the checks to the proper

15   company name, "First Hawaii Title Corporation."

16       40.    After not having heard from Defendants Bohn or Dillon for some time, on January

17   10, 2005, Mr. and Mrs. Miller demanded that they re-issue a check to "Maui Preparatory

18   Academy."  The purpose of making the check to Maui Preparatory Academy was to make a gift

19   to the Academy on behalf of Anne and Molly.  Again, it was believed to be more efficient to

20   make the payment directly to Maui Preparatory Academy rather than for Anne and Molly to

21   receive the money directly, as intended by Elsie Turchen.  Mr. and Mrs. Miller wrote to Bohn

22   and Dillon still believing that they had the authority to issue checks for this purpose.

23   Thereafter, on January 10, 2005, a cashier's check was delivered by Defendant Greensprings to

24   Mr. and Mrs. Miller in the amount of $500,000 made out to Maui Preparatory Academy, exactly

25   as requested by the Millers.  Up until this point, neither Bohn, Dillon, nor anyone at

26   Greensprings ever indicated that they were unauthorized to issue checks as requested by Mr.

27   and Mrs. Miller.

28       41.    On March 18, 2005, Penny Anderson filed her lawsuit in her capacity as Personal

Representative of the Estate of Elsie Turchen against the Defendants Dillon, Bohn and Greensprings, among others (the "Anderson v. Dillon" lawsuit).  The Anderson v. Dillon Complaint (and its amendments) alleged the existence of a conspiracy among those Defendants to fraudulently induce Elsie Turchen into transferring over $20 million in real and personal property to Greensprings, mostly on January 12, 1999 (including the Malcolm Avenue property).  This Complaint alleged that Christine Dillon, in furtherance of this conspiracy, represented to Penny Anderson, just as she represented to the Plaintiffs herein, that she was the Personal Representative of the Turchen estate and made periodic "distributions" to her.  The Complaint also alleged that a co-conspirator, Eric Heath Pennington represented himself as a pastor of Greensprings, but is, in fact, an auto mechanic in San Mateo, California and never a pastor.  The Complaint further alleged that, in furtherance of the conspiracy, the Defendants, including the Defendants herein, befriended Elsie Turchen and her son, Ward Anderson, and became intimately familiar with the properties owned by Elsie Turchen and Ward Anderson, thereby affording the Defendants the opportunity to fraudulently induce Elsie Turchen into transferring the property to Greensprings pursuant to trusts that Ward Anderson allegedly executed prior to his death, of which she was allegedly the trustee and were either defective on their face or simply did not exist.  Penny Anderson further alleged Greensprings did not do any charitable work with the properties, but rather kept the rents and profits of those properties for themselves.  Furthermore, the Complaint alleges that, after Elsie Turchen's death, Defendant Bohn falsely notarized documents that were executed by Defendant Dillon in the name of "Beth Anderson," which is a name Defendant Dillon used to represent herself as Elsie Turchen's sole heir.  These documents were used to complete the Defendants' conspiracy of transferring all of the property owned by Elsie Turchen and Ward Anderson to Greensprings.

42.    Following receipt of the $500,000 cashier's check, Mr. and Mrs. Miller requested on July 22, 2005 that Defendants Bohn and Dillon re-issue the check into three separate checks totaling $500,000 to three new charities: Stanford University, Seabury Hall and West Maui Carden Academy.  On August 10, 2005, Mrs. Miller had a telephone conversation with Defendant Bohn concerning the checks.  During that conversation, Defendant Bohn represented

that the checks would be re-issued the following day.  Once again, Defendant Bohn's actions

and representations exhibited his ostensible and apparent authority to issue checks drawn on

Greensprings' accounts.

43.    At the same time, Mrs. Miller wrote a letter to Defendant Briggs, who Plaintiffs

are informed and believe is the current trustee of Greensprings.  The purpose of this letter was

to explain to Defendant Briggs the situation and why three checks needed to be issued instead

of one.  The following day, on August 11, 2005, Defendant Briggs and Mrs. Miller spoke on the

telephone.  During that telephone conversation, Defendant Briggs requested that Mrs. Miller

return the $500,000.00 cashier's check that was issued by Greensprings.  Briggs also confirmed

Dillon's and Bohn's real, apparent and ostensible authority to act on behalf of Greensprings.

Defendant Briggs stated to Mrs. Miller that Defendants Bohn and Dillon were acting

"informally" in issuing the checks to the charities named by the Millers.  Defendant Briggs

stated that he needed Mrs. Miller to return the cashier's check to him in light of the <u>Anderson v.

Dillon</u> litigation.  Defendant Briggs told Mrs. Miller that if she did not return the check,

Defendant Bohn would be in a lot of trouble with the Court in the <u>Anderson v. Dillon</u> litigation.

Furthermore, during this conversation, the following exchanges took place wherein Defendant

Briggs represented to Mrs. Miller that the Estate of Elsie Turchen has no claim to the funds:

| | | |
|---|---|---|
| Briggs | The problem is, if you go ahead and negotiate the check, you could get Don into a heck of a lot of trouble. |
| Barbara: | Oh I have no intention of doing that. |
| Briggs: | Well see... |
| Barbara: | Nor would I ever cause any problems for Don or Christine |
| Briggs: | But let me explain the situation. It's not really Don's fault. But Don and Christine have been, sort of, behaving very informally. Okay? |
| Barbara: | Right. |
| Briggs: | So they knew what else you wanted, so they just go ahead and do it. The problem is, then there's no record. There's no resolution of the board of directors. There's no, you know, there's no record for the non-profit corporation to show why this stuff is being done. So what they did really was, they issued it without authorization of the corporate board. You see, which technically you're not supposed to do. Nobody cares because they've  never put any money into their own pocket. They're as honest as can be. And they've only done the |

| | | |
|---|---|---|
| 1 | | proper things, you know, in terms of where they've disbursed funds. But see, what I've tried to make them understand is no, no, you've got to it very formally. You've got to have, you know, a resolution of the board of directors approving the issue of it. And then you keep a copy of that. Then you're safe. You see, no one can question it. |

Barbara:    So now, does this have to go before the board of directors too?

Briggs:    No it doesn't. Because at this point I'll have the board of directors approve it in three seconds flat. That's easy.

Barbara:    Okay.

Briggs:    The problem is that right now the court is saying don't move or do anything with any funds at all without letting me know.  So that's why we have to go in front of the court and say in a separate motion, and just say look, your honor, this has nothing to do with this case. But, this lady very honestly and, at our request, has returned the check. Here's the cashiers check. We put it back, we've given it to the bank. The bank is holding it. The bank is ready to issue, you know, the three checks that we want issued. But, out of an abundance of caution because your honor was very, you know, particular about wanting to know what's going on, not wanting us to do stuff without telling the court. Here's what we're doing. If there's any problems with it, if the court has any questions, let us know.

Barbara:    See my big fear is that you're gonna come back and say that it's fallen under unapproved expenditure.

Briggs:    Yeah, but see the board can always ratify an expenditure particularly before it's been, you know, where it's been issued, but if  it hasn't been given yet. See the board, a board of directors has the legal power to ratify that action. In other words, approve it after it was taken.

Barbara:    Okay.

Briggs:    You see, see the board isn't a  problem. The board is on your side. The problem is the court. The court will get angry if the court finds out that we've reissued the checks without telling them anything.

Barbara:    Right.

Briggs:    That would be the problem. And that's what Don was about to do and Christine said, wait a second, you better check with Carl, and he did and that's when I said no, no, no, don't do that. You'll just get the judge mad.

Barbara:    Right.

| | | |
|---|---|---|
| 1 | Briggs: | See, I mean, there's no reason to get him mad. I mean we're not doing anything improper, you just have to explain it to him. |
| 2 | | |
| 3 | Barbara: | Well that was my big fear on this that that would come back and they'd say it was an unapproved expenditure. |
| 4 | | |
| 5 | Briggs: | By the time the court looks at it, if it have any questions, I'll have a resolution from the board ratifying it. |
| 6 | | |
| 7 | Barbara: | Okay. |
| 8 | Briggs: | So, that's not a problem. As far as the non-profit corporation goes, it'll be entirely proper. The only question will be, for the court, does this have something to do with the funds that Penny and Greensprings have a dispute over? And it clearly does not. |
| 9 | | |
| 10 | | |

Defendant Briggs also repeatedly represented to Mrs. Miller that the money would be paid as directed by her:

| | | |
|---|---|---|
| 13 | Briggs: | Any event, that would be my argument [that the funds were not subject to a claim by the estate of Elsie Turchen]. So, worse case scenario, the funds will be sitting for a while in that account earning interest and then would be released. Okay? |
| 14 | | |
| 15 | | |
| 16 | | ... |
| 17 | Barbara: | Okay, and I'm sorry that I didn't get it to you before I left, but as I said, my big fear was that this thing was going to come back as unapproved expenditure. |
| 18 | | |
| 19 | Briggs: | Believe me if, in the worse case scenario if that happened, I still say we'd be able to ultimately settle the case with Penny and your funds would still be sitting there safely in an interest bearing account      . |
| 20 | | |
| 21 | Barbara: | Okay. |
| 22 | Briggs: | Because she has no claim on it. |
| 23 | Barbara: | Right. |
| 24 | Briggs: | You see? Even if she won the case, she still wouldn't get those funds. |
| 25 | | |
| 26 | Barbara: | Okay. |
| 27 | Briggs: | Which is impossible. She can't possibly win. You know, I'm just saying, I just don't see any possibility that anything is going to happen to those fund, and they'll just be sitting there earning interest. |
| 28 | | |

Barbara:      Good. Okay Carl. Thank you very much.

Briggs:       Thanks for your help.

Briggs also confirmed to Mrs. Miller, Dillon's authority to act on behalf of Greensprings by specifically referencing her involvement with its formation at the end of 2001 as follows:

> Well, it's just such a complicated mess, because see, what they did was, Christine called me at the end of 2001 and said would you mind forming this domestic non-profit corporation so Greensprings can transfer into it. And I said fine. Do you need me to do anything else? She said, no, no, no, we have our own counsel. Which I guess was the attorney in Idaho. But what they forgot to do was...

Finally, Briggs represented to Mrs. Miller that, in the event of a settlement of the Penny Anderson lawsuit, the returned funds would still be there and waiting safely as follows:

> Believe me if, in the worse case scenario if that happened, I still say we'd be able to ultimately settle the case with Penny and your funds would still be sitting there safely in an interest bearing account

Plaintiffs relied on these multiple representations by Defendant Briggs that the money would be paid by Greensprings notwithstanding the <u>Anderson v. Dillon</u> litigation. By these statements, Briggs specifically confirmed Dillon's and Bohn's real, apparent and ostensible authority to transact business on behalf of, and direct the actions of, Greensprings. By these multiple representations, Briggs also expressly ratified Dillon's and Bohn's actions on behalf of Greensprings.

44.     Later that day, Defendant Briggs wrote to Mrs. Miller to confirm their earlier conversation. He asked that the January 10, 2005 cashier's check be returned to Greensprings because of litigation against Defendants Greensprings, Bohn and Dillon by Penny Anderson. This letter from Defendant Briggs states that in order to have the checks re-issued, a motion in the <u>Anderson v. Dillon</u> litigation must be filed, which, according to Defendant Briggs, would be made "with all possible haste." Defendant Briggs also represented that the funds to cover the $500,000 would be maintained in a separate, interest-bearing account earmarked for the charities named by Mr. and Mrs. Miller. Barbara Miller returned the cashier's check to Defendant Briggs on August 16, 2005, in reliance on these representations, and on the earlier representations by Briggs that payment of the money would be approved by the Greensprings board of directors. Plaintiffs also relied on the apparent and ostensible authority in Defendant Briggs'

representations that he would make sure that the $500,000.00 would be paid as directed by Plaintiffs. Plaintiffs are informed and believe that Defendant Greensprings never filed any motion in the <u>Anderson v. Dillon</u> litigation to issue the checks. Instead, Plaintiffs are informed and believe that Defendant Greensprings settled the <u>Anderson v. Dillon</u> litigation in part by paying the $500,000.00 that was represented by Defendants to be paid to charities of the Plaintiffs' choice to the Estate of Elsie Turchen.

45. As a result of Defendants' actions in issuing checks as demanded by Plaintiffs, and as a result of the multiple representations made by Defendants that the $500,000 would be paid as directed by Plaintiffs, Plaintiffs Robert Miller and Barbara Miller felt that they had received enough assurances that the $500,000 would be donated as directed by them. Therefore**,** in reliance on those representations and actions, Plaintiffs Robert Miller and Barbara Miller pledged $200,000.00 Seabury Hall. Now, since Greensprings has not paid as promised**,** on March 20, 2007**,** Seabury Hall began pursuing collection of the pledge for personal payment by the Millers.

46. No Defendant herein has ever explained why Greensprings paid the $500,000.00 as directed by Plaintiffs on the occasions described herein.

## IV.

## <u>FIRST CAUSE OF ACTION</u>

### (Breach of Contract - Promissory Estoppel)

47. Plaintiffs reallege and incorporate by reference Paragraphs 1 through 46 as though fully set forth herein.

48. In or about 2001, Defendant Dillon represented to Plaintiffs that she was the personal representative of the estate of Elsie Turchen and that Defendant Grace Parish Christian Church would pay the $500,000.00 as Elsie desired.

49. In so doing, Defendant Dillon knew or should have known that Plaintiffs would be reasonably induced to rely on Defendant Dillon's representation by not making any claim against the estate of Elsie Turchen for payment of the $500,000.00.

50.    Plaintiffs reasonably relied on Defendant Dillon's representation and were induced to forego making any claim whatsoever in the probate estate of Elsie Turchen.

51.    At the time Defendant Dillon made her representations, Plaintiffs relied on the apparent and ostensible authority that Dillon exhibited in making these representations.

52.    Defendant Dillon has not performed any part of her representation.

53.    In addition, Defendant Bohn issued checks on two separate occasions totaling $500,000.00, drawing funds from funds owned by Greensprings. The funds were payable to charities as directed by Bob and Barbara Miller on behalf of Anne and Molly Miller. Plaintiffs decided that it would be more efficient for the money to be paid directly to the chosen charity or charities rather than for Anne and Molly to receive the money directly, as intended by Elsie Turchen. At the time the checks were issued, Plaintiffs relied on the apparent and ostensible authority demonstrated by Defendant Bohn in his representations and actions in issuing checks for $500,000.00 as demanded by Plaintiffs.

54.    Furthermore, Defendant Briggs affirmatively represented to Barbara Miller that the money would be paid to the charities of Plaintiffs' choice so long as the certified check was returned to Greensprings. Defendant Briggs also represented to Plaintiffs that cutting new checks as directed by Plaintiffs would be a mere formality and that money would be forthcoming. Again, Plaintiffs relied on the apparent and ostensible authority demonstrated by Defendant Briggs in his representations that the $500,000.00 would be paid by Greensprings as demanded by Plaintiffs.

55.    By actually paying the money as directed by Plaintiffs, and by later assuring that the money would be forthcoming as directed by Plaintiffs, Defendants knew or should have known that Plaintiffs would forego making any further claim to the $500,000.00 from the Estate of Elsie Turchen.

56.    Plaintiffs reasonably relied on Defendant Greensprings' representation and was induced into foregoing the filing of any further claim against the estate of Elsie Turchen or any other defendant in this matter. Plaintiffs were also induced into returning the $500,000 cashier's check to Defendant Greensprings.

57.    In addition, Plaintiffs Barbara Miller and Robert Miller reasonably relied on the Defendants' actions and representations by making a pledge to Seabury Hall in the amount of $200,000.00, which was to have been satisfied by the payment made by Greensprings. **As a result of this pledge, on March 20, 2007, Seabury Hall began its pursuit of the payment of the pledge by Barbara Miller and Robert Miller in reliance on Defendants' promises.**

58.    Defendant Greensprings has not performed any part of its representation.

59.    As a proximate result of Defendants' failure to perform according to the representations that they made to Plaintiffs, Plaintiffs have been damaged in the sum of $500,000.00.

60.    Alternatively, as a proximate result of Defendants' failure to perform according to the representations that they made to Plaintiffs, Robert and Barbara Miller have been damaged in the sum of $200,00.00.

61.    Injustice can be avoided only by enforcing the Defendants' representations completely.

## V.

## SECOND CAUSE OF ACTION

### (Conversion)

62.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 61 as though fully set forth herein.

63.    At all times herein mentioned, Molly Miller (by Molly's guardian, Barbara Miller) and Anne Miller were and still are entitled to possession of $500,000.00.  Molly Miller (by her guardian) and Anne Miller are entitled to possession of these funds because Defendants acknowledged, by their representations and actions, that Elsie Turchen intended to give a substantial gift to Molly and Anne Miller and the $500,000.00 payments to the charities were on the Millers' behalf.

64.    On or about August 16, 2005, Defendant Greensprings, through its agent, Defendant Briggs, took possession of the $500,000.00 cashier's check from Plaintiffs'

1    possession and converted the same to its own use.

2        65.    Prior to that date, Defendants confirmed Plaintiffs' rightful possession of the

3    $500,000.00 by issuing and delivering checks as directed by Plaintiffs in confirmation of Elsie

4    Turchen's intent to give a gift to Anne and Molly Miller.

5        66.    Defendant Greensprings' actions alleged above were willful, wanton, malicious,

6    and oppressive, were undertaken with the intent to defraud, and justify awarding of exemplary

7    and punitive damages.

8

9                                          **VI.**

10                          **THIRD CAUSE OF ACTION**

11                                      **(Fraud)**

12        67.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 67 as though

13    fully set forth herein.

14        68.    In or about 2001, Defendant Dillon represented to Plaintiffs that she was the

15    personal representative of the estate of Elsie Turchen and that Defendant Grace Parish Christian

16    Church would pay the $500,000.00 as Elsie desired.

17        69.    At the time the Defendant Dillon made the promise to the Plaintiffs, neither she nor

18    Defendant Grace had any intention of performing it.

19        70.    The promise was made by Defendant Dillon with the intent to induce the Plaintiffs

20    to forego making any claim whatsoever in the probate estate of Elsie Turchen.

21        71.    The Plaintiffs, at the time this promise was made and at the time the Plaintiffs took

22    the actions herein alleged, were ignorant of Defendant Dillon's and Defendant Grace's secret

23    intention not to perform and Plaintiffs could not, in the exercise of reasonable diligence, have

24    discovered Defendant Dillon's and Defendant Grace's secret intention.  In reliance on the

25    promise of Defendant Dillon and Defendant Grace, Plaintiffs made no claim against the estate of

26    Elsie Turchen.  If Plaintiffs had known of the actual intention of Defendant Dillon and

27    Defendant Grace, Plaintiffs would not have taken such action.

28        72.    In addition, Defendant Bohn issued checks on two separate occasions totaling

$500,000.00, drawing funds from funds owned by Greensprings. The funds were payable to charities as directed by Bob and Barbara Miller on behalf of Anne and Molly Miller. At the time the checks were issued, Plaintiffs had no reason to believe that either Bohn or Greensprings lacked the authority to issue those funds in the manner demanded by Plaintiffs. Furthermore, Defendant Briggs affirmatively represented to Mrs. Miller that, upon return of the check to him, he would explain to the Court what happened with the issuance of the check, that the payment of the money was legitimate, and that the Court should allow Greensprings to re-issue checks as directed by the Millers. Defendant Briggs stated that the Greensprings board of directors was willing to approve the expenditure of the $500,000.00 that was paid previously. In addition, Defendant Briggs represented to Mrs. Miller that the $500,000.00 expenditure had nothing to do with the Anderson v. Dillon litigation. Defendant Briggs also represented that the whole point of issuing the checks was to further the charitable intents of Elsie Turchen. Defendant Briggs also represented to Mrs. Miller that a motion in the Anderson v. Dillon litigation would be made quickly so that the $500,000.00 could be released as requested by the Millers.

73.    At the time the Defendants made the promise to the Plaintiffs, the Defendants had no intention of performing it.

74.    The promise was made by the Defendants with the intent to induce the Plaintiffs to forego making any further claim to the $500,000.00 and with the intent to induce the Plaintiffs to return the $500,000.00 cashier's check to Defendant Greensprings.

75.    The Plaintiffs, at the time this promise was made and at the time the Plaintiffs took the actions herein alleged, were ignorant of Defendants' secret intention not to perform and Plaintiffs could not, in the exercise of reasonable diligence, have discovered Defendants' secret intention. In reliance on the promise of Defendants, Plaintiffs made no further claim for payment of the $500,000.00 and returned the cashier's check to Defendant Greensprings. In further reliance on the promises of the Defendants, Plaintiffs Barbara and Robert Miller pledged $200,000.00 to Seabury Hall, a pledge that Seabury Hall is now attempting to collect personally from Barbara and Robert Miller. If Plaintiffs had known of the actual intention of Defendants, Plaintiffs would not have taken such actions.

76.    As a result of Defendants' actions, Plaintiffs have been damaged in the amount of $500,000.00. Alternatively, Plaintiffs Barbara and Robert Miller have been damaged in the amount of $200,000.00 on account of their pledge to Seabury Hall.

77.    Defendants' actions alleged above were willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify awarding of exemplary and punitive damages.

## VII.

## THIRD CAUSE OF ACTION

### (Declaratory Relief)

78.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 77 as though fully set forth herein.

79.    A genuine controversy exists between Molly Miller (by Molly's guardian, Barbara Miller) and Anne Miller concerning their respective rights and duties in that Plaintiffs contend that the $500,000.00 belongs to them, whereas Plaintiffs are informed and believe that Defendant Greensprings disputes these contentions and contends that the money belongs to them.

80.    Plaintiffs desire a judicial determination of their rights and duties, and a declaration as to whether the $500,000.00 belongs to Plaintiffs.

81.    A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights and duties with respect to the $500,000.00 payment from Greensprings. The unsettled state of affairs causes a burden to the Plaintiffs because they are uncertain as to whether they can fulfill commitments to the charities to whom the $500,000 is to be paid.

/ / / /

/ / / /

/ / / /

/ / / /

1

2

3

**VIII.**

**FOURTH CAUSE OF ACTION**

**(Imposition of Constructive Trust)**

4      82.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 81 as though

5    fully set forth herein.

6      83.    By reason of the manner by which Defendant Greensprings has maintained the

7    $500,000.00 intended for Molly and Anne, and the receipts and profits thereon, Defendant

8    Greensrpings is an involuntary trustee holding such property, and the receipts and profits

9    thereon, in a constructive trust for Plaintiffs with the duty to reconvey the same to Plaintiffs

10   forthwith.

11      84.    Plaintiffs have no adequate remedy at law and imposition of a constructive trust is

12   required to avoid the perpetration of a fraud and unjust enrichment of Defendant Greensprings.

13

14

15

16

**IX.**

**SIXTH CAUSE OF ACTION**

**(Specific Performance)**

17      85.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 84 as though

18    fully set forth herein.

19      86.    At all times relevant herein, Defendants represented to Plaintiffs that Greensprings

20    would fulfill Elsie Turchen's desire to make a gift to Anne and Molly Miller by paying

21    $500,000.00 to the charity or charities of Plaintiffs' choice.  Plaintiffs relied on the

22    representations of Defendants and chose to forego making any claim to the gift promised to

23    Anne and Molly Miller by Elsie Turchen.

24      87.    Furthermore, Defendant Briggs represented to Plaintiffs that, if the cashier's check

25    for $500,000.00 was returned to Defendant Greensprings, Defendant Greensprings would pay

26    the $500,000.00 to the charity or charities of Plaintiffs' choice.  Plaintiffs relied on these

27    representations and chose to return the cashier's check to Greensprings.

28      88.    Plaintiffs have performed all conditions, covenants, and promises required by them

Page 24

First Amended Complaint for Breach of Contract - Promissory Estoppel; Conversion; etc.

1    on their part to be performed in reliance on the representations made by Defendants.

2        89.    Defendant Greensprings has failed and refused, and continues to fail and refuse, to

3    pay the $500,000.00 to the charity or charities of Plaintiffs' choice as represented by Plaintiffs.

4        90.    For the reasons heretofore stated, Plaintiffs have no adequate legal remedy in that

5    Plaintiffs may not now make any claim for a transfer of the gift to Anne and Molly Miller from

6    the Estate of Elsie Turchen because the applicable statute of limitations bars such a claim.

7

8                                    **X.**

9                        **SEVENTH CAUSE OF ACTION**

10                **(Intentional Interference With Right To Inherit)**

11        91.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 90 as though

12    fully set forth herein.

13        92.    Elsie Turchen's November 23, 2000 letter expressed her desire to make a

14    substantial gift to Anne and Molly Miller, believing that she still owned the Malcolm Avenue

15    property.

16        93.    Plaintiffs are informed and believe and thereupon allege that Defendants were

17    aware of Elsie's relationship with Anne and Molly Miller and Elsie's desire to give a gift of the

18    Malcolm Avenue property to Anne and Molly Miller.

19        94.    Defendants knew of this desire and engaged in conduct and actions intentionally

20    denying Plaintiffs' right to receive the benefits of Elsie's desired gift by defrauding Elsie into

21    transferring her property to Greensprings.

22        95.    As a proximate result of Defendants' conduct, Anne and Molly Miller were

23    deprived of the inheritance to which they otherwise would be entitled.

24        96.    Plaintiffs have been damaged in the amount of $500,000.00.

25        97.    Defendants, in doing the things alleged herein, acted intentionally and with malice,

26    oppression, and fraud, as those terms are defined in California Code of Civil Procedure §3294,

27    and Plaintiffs are entitled to an award of exemplary and punitive damages against Defendants in

28    such amount as will adequately punish Defendants.

**X1.**

## EIGHTH CAUSE OF ACTION

### (Negligent Interference With Right To Inherit)

98.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 97 as though fully set forth herein.

99.     Elsie Turchen's November 23, 2000 letter expressed her desire to make a substantial gift to Anne and Molly Miller, believing that she still owned the Malcolm Avenue property.

100.    Plaintiffs are informed and believe and thereupon allege that Defendants were aware of Elsie's relationship with Anne and Molly Miller and Elsie's desire to give a gift of the Malcolm Avenue property to Anne and Molly Miller.

101.    Defendants knew of this desire and engaged in conduct and actions negligently denying Plaintiffs' right to receive the benefits of Elsie's desired gift.

102.    As a proximate result of Defendants' conduct, Plaintiffs were deprived of the inheritance to which they otherwise would be entitled.

**XII.**

## PRAYER

WHEREFORE, Plaintiffs pray as follows:

1.      For judgment against the Defendants and in favor of the Plaintiffs in the amount of $500,000;

2.      Alternatively, for judgment against Defendants and in favor of Robert and Barbara Miller in the amount of $200,000.00;

3.      For a declaration that $500,000.00 belongs to Plaintiffs;

4.      For interest at the legal rate on the foregoing sum pursuant to Section 3336 of the Code of Civil Procedure from and after August 16, 2005;

5.      For an order declaring that Defendant Greensprings holds $500,000.00 in trust for Plaintiffs, and compelling Defendant Greensprings to convey and transfer the money to

1  Plaintiffs;

2        6.      For an order directing Defendant Greensprings to pay $500,000.00 to a charity or

3  charities of Plaintiffs' choice;

4        7.      For punitive and exemplary damages;

5        8.      For costs of suit herein; and

6        9.      For such other and further relief as the Court may deem just and proper.

7  Date: March 28, 2008                              TEMMERMAN & CILLEY, LLP

8

9                                           By:      /s/ Mark A. Schmuck
                                                     JAMES P. CILLEY, ESQ.
10                                                   MARK SCHMUCK, ESQ.
                                                     Attorneys for Plaintiffs
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28