1  James P. Cilley, Esq.  (SB#168118)
   Mark A. Schmuck, Esq.  (SB#205164)
2  **TEMMERMAN & CILLEY, LLP**
   2502 Stevens Creek Blvd.
3  San Jose, California 95128-1654
   Tel: (408) 998-9500
4  Fax: (408) 998-9700

5  Attorney for Plaintiffs

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  BARBARA MILLER, individually and    )   Case No.: C 07-04776 JL
    as guardian ad litem of Molly Miller, an  )
12  individual; ANNE MILLER, an         )   **PLAINTIFFS' OPPOSITION TO**
    individual; and ROBERT MILLER, an   )   **DEFENDANT GREENSPRINGS' MOTION**
13  individual,                         )   **TO DISMISS FOR FAILURE TO STATE A**
                                        )   **CLAIM UPON WHICH RELIEF CAN BE**
14                 Plaintiffs,          )   **GRANTED**
                                        )
15  v.                                  )
                                        )   Date:  June 4, 2008
16                                      )   Time: 9:30 a.m.
    GREENSPRINGS BAPTIST               )   Dept.: F, 15th Floor
17  CHRISTIAN FELLOWSHIP TRUST, a      )   Judge: Hon. James Larson
    business entity of unknown form;    )
18  CARLETON L. BRIGGS, an             )
    individual; CHRISTINE DILLON, an    )
19  individual; DONALD BOHN, an         )
    individual; GRACE PARISH            )
20  CHRISTIAN CHURCH, a business        )
    entity of unknown form; and DOES 1  )
21  through 50, inclusive,              )
                                        )
22                 Defendants.          )

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III.    LEGAL DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

        A.      Standards Governing 12(b)(6) Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

        B.      Plaintiffs Have Stated A Good Claim For Breach of Contract.. . . . . . . . . . . . . .   8

                Greensprings' Duress Argument Does Not Apply. . . . . . . . . . . . . . . . . . . . .   11

                Greensprings' Illegality Argument Misstates the Law. . . . . . . . . . . . . . . . . . .   12

        C.      The First Amended Complaint Is Not Time-Barred. . . . . . . . . . . . . . . . . . . . .   14

        D.      Plaintiffs Have Standing To Sue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

        E.      Plaintiffs Can Recover Damages For Conversion. . . . . . . . . . . . . . . . . . . . . .   15

        F.      The First Amended Complaint States A Valid Cause Of Action For
                Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

        G.      Plaintiffs Have Sufficiently Pled A Declaratory Relief Cause of
                Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

        H.      Imposition of a Constructive Trust is Appropriately Pled. . . . . . . . . . . . . . . . .   18

        I.      Specific Performance Is Adequately Pled. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

        J.      Interference With Right To Inherit Is Adequately Pled. . . . . . . . . . . . . . . . . . .   19

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

# TABLE OF AUTHORITIES

**CASES**

Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . .  8

Busick v. Workmen's Comp. Appeals Bd. (1972) 7 Cal.3d 967, 974. . . . . . . . . . . . . . . . . . . .  17

Gilligan v. Jamco Development Corp., 108 F.3d 246, 249 (9th Cir. 1997). . . . . . . . . . . . . .  7

Haigler v. Donnelly, 18 Cal.2d 674, 681 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Laks v. Coast Federal Savings and Loan Ass'n, 60 Cal. App. 3d 885, 890. . . . . . . . . . . . . .  9

Lujan v. Defenders of Wildlife (1992) 504 U.S. 555, 560-561. . . . . . . . . . . . . . . . . . . . . . . .  15

Neitzke v. Williams, 490 U.S. 319, 328-329 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Niles v. Louis H. Rapoport & Sons, Inc. (1942) 53 Cal. App. 2d 644, 651. . . . . . . . . . . . . .  14

Olson v. Toy (1996) 46 Cal.App.4th 818, 823. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Parks School of Business, Inc. V. Symington, 51 F.3d 1480 (9th Cir. 1995). . . . . . . . . . . . . .  7

Romano v. Rockwell Int'l, Inc. (1996) 14 Cal.4th 479, 488. . . . . . . . . . . . . . . . . . . . . . . . . .  14

Smith v. City and County of San Francisco, 225 Cal.App.3d 38, 48 (1990). . . . . . . . . . . . . .  8

Steele v. Marsicano, 102 Cal. 666, 669 (1894). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Tomerlin v. The Canadian Indemnity Company, 61 Cal.2d 638, 649 (1964). . . . . . . . . . . . . .  10

United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . .  7

**STATUTES**

Civil Code § 1667. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Civil Code § 2223. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Civil Code § 2224. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Code of Civil Procedure § 339. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Code of Civil Procedure § 1060 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Federal Rule of Civil Procedure 12(b)(6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 8, 11, 15

**OTHER AUTHORITIES**

1

Restatement (Second) of Contracts § 90(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2

2 Schwarzer, et al. California Practice Guide: Federal Civil Procedure Before Trial (rev. 2007) ¶ 9:210. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3

4

1 Witkin Summary of California Law § 244 (10th Ed. 2007). . . . . . . . . . . . . . . . . . . . . . . 8

5

1 Witkin, Summary of California Law (10th ed. 2005) "Contracts," § 244, at 275. . . . . . . . . . . 8

6

1 Witkin Summary of California Law § 253 (10th Ed. 2005, 2007). . . . . . . . . . . . . . . . . . . 11

7

1 Witkin Summary of California Law Contracts § 440 (10th Ed. 2007). . . . . . . . . . . . . . . . 13

8

1 Witkin Summary of California Law Contracts § 451 (10th Ed. 2007). . . . . . . . . . . . . . . . 13

9

1 Witkin Summary of California Law Torts § 703 (10th Ed. 2007). . . . . . . . . . . . . . . . . . . 15

10

5 Witkin Summary of California Law Torts § 699 (10th Ed. 2007). . . . . . . . . . . . . . . . . . . 15

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# I.

2

## INTRODUCTION

3     The First Amended Complaint presently before the Court is simply an attempt by the

4   Plaintiffs to enforce promises by the Defendants.  This case boils down to the following simple

5   facts: (1) the Defendants made promises and representations to pay money to charities of the

6   Plaintiffs' choice on Plaintiffs' behalf; (2) the Defendants *acted on those promises* by issuing

7   checks; (3) Plaintiffs reasonably *relied on Defendants' promises;* (4) the Defendants failed to follow

8   through on those promises.

9     In their motion to dismiss, the Defendants now attempt to convince this court that, despite

10  their actions and representations, the Plaintiffs cannot proceed against them on any of the causes

11  of action alleged in the First Amended Complaint.  What the Defendants have not, and cannot,

12  explain is why they issued checks to charities at the Plaintiffs' direction in an amount totaling

13  $500,000.00, in the first place.  The First Amended Complaint alleges, and the evidence will

14  demonstrate, that the Defendants made their promises to pay money to the charities of Plaintiffs'

15  choice and acted on their promises with full knowledge of the Plaintiffs' reliance so as to prevent

16  the Plaintiffs from either presenting a claim against the Estate of Elsie Turchen or cause any inquiry

17  into or scrutiny of the Defendants' actions as the purported personal representative of the Estate of

18  Elsie Turchen.  However, once a lawsuit was filed by Penny Anderson, which did shed light on the

19  Defendants' actions and misrepresentations in connection with the Estate of Elsie Turchen, the

20  Defendants' actions towards the Plaintiffs changed immediately, they fraudulently induced return

21  of the cashier's check they had issued and, thereafter, failed and refused to follow through on the

22  promises they had made to the Plaintiffs.

23    This Court should not now allow the Defendants to avoid the consequences of making false

24  representations to the Plaintiffs who reasonably relied on them simply because the Defendants no

25  longer find it expedient to avoid review of or inquiring into the Estate of Elsie Turchen.

26  Accordingly, the Court should deny the Defendants' motion and allow this case to go to trial.

27

28

Opposition to Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted

1

2

## II.

## **STATEMENT OF FACTS**[1]

3    The First Amended Complaint alleges that Ward Anderson and Elsie Turchen, son and

4    mother, owned numerous parcels of real property in San Mateo County, California.  Approximately

5    10 years before Elsie Turchen died, Defendant Christine Dillon, then known as Christine

6    Maserdotti, introduced herself to Elsie and held herself out as a paralegal and offered her services

7    to Elsie.  Over the years, defendant Dillon ingratiated herself with Elsie Turchen by offering her

8    friendship and companionship after Ward Anderson died.   By becoming so close to Elsie,

9    Defendant Dillon became privy to information about the family's personal and financial affairs,

10   including but not limited to Ward Anderson's and Elsie Turchen's extensive real property holdings.

11   Plaintiffs are informed and believe, and thereupon allege, that Defendant Dillon induced Elsie

12   Turchen to execute multiple deeds on January 12, 1999, falsely representing to Elsie Turchen that

13   in so doing, Elsie Turchen would be making a charitable gift to a religious organization.

14   The First Amended Complaint alleges that Defendants  in furtherance of the conspiracy to

15   divest the real property from its rightful owners, misrepresented and/or misled Elsie Turchen into

16   the belief that the real property she and her son had amassed should be donated to a Christian charity

17   such as Greensprings Fellowship Trust and Greensprings Fellowship Church, Inc., both of which

18   entities Defendants represented to Elsie Turchen as being Internal Revenue Code compliant

19   501(c)(3) organizations engaged in good works.  Prior to Elsie Turchen's death, substantially all of

20   Elsie Turchen's and Ward Anderson's extensive real property holdings were transferred to various

21   trusts that are alleged to be invalid or do not exist.  Plaintiffs allege that these transfers were

22   procured by fraud and/or the exercise of undue influence over Elsie by Defendants.  One of these

23   properties was 325 Malcom Avenue, Belmont, California, which is the partial subject of this

24   lawsuit.

25   Following Elsie's death, Defendant Dillon represented to several people, including Plaintiffs

26   herein, that she was the personal representative of the Estate of Elsie Turchen.  She also executed

27

28   _____

[1]The facts will be summarized briefly here.  Plaintiffs respectfully refer the Court to the First Amended Complaint for a complete recitation of Plaintiffs' allegations.

and caused to be notarized several deeds and certifications of trust in connection with the Anderson/Turchen properties in the name of "Beth Anderson," a name that Defendant Dillon used to convince others that she was an heir of Ward Anderson. These deeds and certifications were notarized by Defendant Donald Bohn. Ultimately, substantially all of the Anderson/Turchen real estate holdings were transferred to Defendant Greensprings Baptist Christian Fellowship Trust.

Also prior to her death, Elsie Turchen Elsie expressed in writing her intent to give a substantial gift to Anne and Molly Miller. Elsie's November 23, 2000 letter, written to Barbara and Robert Miller, stated, in pertinent part:

> "I would like to do something for your girls. I do not shop; and I don't want to send things that have to be exchanged or are not useful, so I have failed to do anything on either Annie's or Molly's birthdays.
>
> Would you consider the gift of the house for them? Enclosed is the picture. . . .
>
> It will go vacant approximately 2/1/2001.
>
> As you know, I am very ill. . . ."

Elsie's clear intent was to give Anne and Molly the house located at 325 Malcolm Avenue, Belmont, California. At the time she wrote this letter, Plaintiffs are informed and believe that Elsie thought she owned the Malcolm Avenue property, despite the deed purportedly transferring this property to the Greensprings Trust procured on January 12, 1999.

As stated above, Defendant Dillon also represented to Barbara Miller that she was the personal representative of the Estate of Elsie Turchen. Defendant Dillon knew about Elsie's gift to Anne and Molly at the time Dillon made the representation to Barbara Miller because Dillon had a copy of Elsie's letter. Knowing about Elsie's gift to Anne and Molly, Defendant Dillon entered into an agreement with Plaintiffs that Grace Parish Christian Church (which Plaintiffs are informed and believe never existed) would pay $500,000.00 (in place of a gift of the Malcolm Avenue property) to a charity or charities of Robert's and Barbara's choice on behalf of Anne and Molly. Plaintiffs decided that it would be more efficient for the money to be paid directly to the chosen charity or charities rather than for Anne and Molly to receive the money directly, as intended by Elsie Turchen. Plaintiffs are informed and believe that Defendant Dillon proposed to make this charitable payment so that Anne and Molly would not make any claim against the Turchen estate

1  for payment of the gift directly to Anne and Molly.

2      On August 11, 2002, two checks totaling $500,000.00 were issued to "First Hawaiian Title
3  Company." The checks were issued to a title company because the Millers' chosen charity, the
4  Maui Preparatory Academy, was in the process of purchasing real property for use as a school and
5  the $500,000 was paid towards that purchase. The two checks were drawn on an account in the
6  name of "Real Estate Trust," which Plaintiffs are informed and believe is owned by Defendant
7  Greensprings. These checks were signed by Defendant Bohn. These checks were intended to be
8  performance on the agreement by Defendant Dillon (and now by Defendant Greensprings) to fulfill
9  Elsie Turchin's promise to make a gift to Anne and Molly as indicated in Elsie's November 23,
10  2000 letter. Robert and Barbara Miller later learned that the checks were made out to First
11  Hawaiian Title Company and that such an entity did not exist. On October 9, 2002, Mr. and Mrs.
12  Miller sent a letter to Defendants Bohn and Dillon and asked them to reissue the checks to the
13  proper company name, "First Hawaii Title Corporation."

14      After not having heard from Defendants Bohn or Dillon for some time, on January 10, 2005,
15  Mr. and Mrs. Miller demanded that they re-issue a check to "Maui Preparatory Academy." The
16  purpose of making the check to Maui Preparatory Academy was to make a gift to the Academy on
17  behalf of Anne and Molly. Again, it was believed to be more efficient to make the payment directly
18  to Maui Preparatory Academy rather than for Anne and Molly to receive the money directly, as
19  intended by Elsie Turchen. Thereafter, on January 10, 2005, a cashier's check was delivered by
20  Defendant Greensprings to Mr. and Mrs. Miller in the amount of $500,000 made out to Maui
21  Preparatory Academy, exactly as requested by the Millers.

22      Up to this point, the Defendants were completely cooperative in issuing the checks in
23  accordance with the Plaintiffs' direction. The First Amended Complaint alleges that the Plaintiffs
24  did not take any action to enforce any obligation of the Estate of Elsie Turchen to fulfill the
25  decedent's desire to make a substantial gift to Anne and Molly Miller. The Defendants' issuance
26  of the checks also prevented any investigation of the Defendants' handling of Elsie Turchen's
27  Estate, which was likely a motive for Defendants making the payments in the first place. However,
28  beginning at the time that the Anderson v. Dillon lawsuit was filed, everything changed. In very

short order after the lawsuit was filed, the Defendants demanded that the $500,000.00 cashier's check be returned with the assurance that the money would be paid by filing a motion in the <u>Anderson v. Dillon</u> lawsuit.  Now, instead of being cooperative in making the payment, the Defendants were actually *taking the money back* under circumstances that ultimately prevented Plaintiffs from now making a claim in that litigation.

On March 18, 2005 (nearly 3 years after the first checks were issued to First Hawaiian Title Company), Penny Anderson filed her lawsuit in her capacity as Personal Representative of the Estate of Elsie Turchen against the Defendants Dillon, Bohn and Greensprings, among others (the "<u>Anderson v. Dillon</u>" lawsuit).  The <u>Anderson v. Dillon</u> Complaint (and its amendments) alleged the existence of a conspiracy among those Defendants to fraudulently induce Elsie Turchen into transferring over $20 million in real and personal property to Greensprings, mostly on January 12, 1999 (including the Malcolm Avenue property).

Following receipt of the $500,000 cashier's check, Mr. and Mrs. Miller requested on July 22, 2005 that Defendants Bohn and Dillon re-issue the check into three separate checks totaling $500,000 to three new charities: Stanford University, Seabury Hall and West Maui Carden Academy.  On August 10, 2005, Mrs. Miller had a telephone conversation with Defendant Bohn concerning the checks.  During that conversation, Defendant Bohn represented that the checks would be re-issued the following day.  Once again, Defendant Bohn's actions and representations exhibited his ostensible and apparent authority to issue checks drawn on Greensprings' accounts.

At the same time, Mrs. Miller wrote a letter to Defendant Briggs, who Plaintiffs are informed and believe is the current trustee of Greensprings.  The purpose of this letter was to explain to Defendant Briggs the situation and why three checks needed to be issued instead of one.  The following day, on August 11, 2005, Defendant Briggs and Mrs. Miller spoke on the telephone.  During that telephone conversation, Defendant Briggs requested that Mrs. Miller return the $500,000.00 cashier's check that was issued by Greensprings.  Briggs also confirmed Dillon's and Bohn's real, apparent and ostensible authority to act on behalf of Greensprings.  Defendant Briggs stated to Mrs. Miller that Defendants Bohn and Dillon were acting "informally" in issuing the checks to the charities named by the Millers.  Defendant Briggs stated that he needed Mrs. Miller

1   to return the cashier's check to him in light of the <u>Anderson v. Dillon</u> litigation.  Defendant Briggs

2   told Mrs. Miller that if she did not return the check, Defendant Bohn would be in a lot of trouble

3   with the Court in the <u>Anderson v. Dillon</u> litigation.  Furthermore, during this conversation,

4   Defendant Briggs represented to Mrs. Miller that the payment of the $500,000.00 would be

5   approved by the board of Greensprings, that the Estate of Elsie Turchen was not entitled to that

6   money in the first place, and that a motion would be filed in the <u>Anderson v. Dillon</u> lawsuit seeking

7   authorization to pay the $500,000.00 as directed by the Millers.  Later that day, Defendant Briggs

8   wrote to Mrs. Miller to confirm their earlier conversation, including the representations as to how

9   the money would be paid as directed by the Millers.

10        Barbara Miller returned the cashier's check to Defendant Briggs on August 16, 2005, in

11   reliance on these representations, and on the earlier representations by Briggs that payment of the

12   money would be approved by the Greensprings board of directors.  Plaintiffs also relied on the

13   apparent and ostensible authority in Defendant Briggs' representations that he would make sure that

14   the $500,000.00 would be paid as directed by Plaintiffs.  Plaintiffs are informed and believe that

15   Defendant Greensprings never filed any motion in the <u>Anderson v. Dillon</u> litigation to issue the

16   checks.  Instead, Plaintiffs are informed and believe that Defendant Greensprings settled the

17   <u>Anderson v. Dillon</u> litigation in part by paying the $500,000.00 that was represented by Defendants

18   to be paid to charities of the Plaintiffs' choice to the Estate of Elsie Turchen.

19        As a result of Defendants' actions in issuing checks as demanded by Plaintiffs, and as a

20   result of the multiple representations made by Defendants that the $500,000 would be paid as

21   directed by Plaintiffs, Plaintiffs Robert Miller and Barbara Miller felt that they had received enough

22   assurances that the $500,000 would be donated as directed by them. Therefore**,** in reliance on those

23   representations and actions, Plaintiffs Robert Miller and Barbara Miller pledged $200,000.00 to

24   Seabury Hall.  Now, since Greensprings has not paid as promised**,** on March 20, 2007**,** Seabury Hall

25   began pursuing collection of the pledge for personal payment by the Millers.

26        No Defendant herein has ever explained why Greensprings in the first place paid the

27   $500,000.00 as directed by Plaintiffs on the occasions described herein.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

## <u>LEGAL DISCUSSION</u>

### A.    <u>Standards Governing 12(b)(6) Motions</u>

In ruling on a Rule 12(b)(6) motion, the Court must construe the Complaint in the light most favorable to the Plaintiff.[2]  Furthermore, the Court must accept as true all material allegations of the Complaint, as well as reasonable inferences to be drawn from them,[3] no matter how unlikely.[4]

In addition, many courts (including the Ninth Circuit) view Rule 12(b)(6) motions with disfavor because of the limited role that pleadings play in federal practice and the liberal policy concerning amendment of pleadings.  In fact, the Ninth Circuit has stated that Rule 12(b)(6) motions are *"rarely granted."*[5]  Also, dismissal pursuant to Rule 12(b)(6) is only proper in "extraordinary" cases.[6]

Greensprings claims that the Plaintiffs' claims against it are so defective that dismissal pursuant to Rule 12(b)(6) is the only appropriate remedy.  This is not the case.  The pleadings disclose sustainable claims against Greensprings (as well as the other defendants) that deserve examination at trial.  As discussed below, there are undisputed facts stated in the complaint that the Defendants represented on several occasions that the $500,000.00 would be paid as directed by the Plaintiffs; the Plaintiffs relied on those promises by foregoing any claim against the Estate of Elsie Turchen or participating in the <u>Anderson v. Dillon</u> action and, separately, Robert and Barbara Miller made an enforceable pledge to Seabury Hall in reliance on those promises; the reliance was reasonable in that there would be no reason for any judicial claim to be made when there were reasonable assurances by Greensprings that the money was forthcoming; and there were damages to the Plaintiffs because the money was to be paid on behalf of Anne and Molly Miller and,

---

[2] <u>Parks School of Business, Inc. V. Symington</u>, 51 F.3d 1480 (9th Cir. 1995).

[3] <u>Pareto v. F.D.I.C.</u>, 139 F.3d 696, 699 (9th Cir. 1998)

[4] <u>Neitzke v. Williams</u>, 490 U.S. 319, 328-329 (1989).

[5] <u>Gilligan v. Jamco Development Corp.</u>, 108 F.3d 246, 249 (9th Cir. 1997) (emphasis added); <u>see also</u> 2 Schwarzer, et al. <u>California Practice Guide: Federal Civil Procedure Before Trial</u> (rev. 2007) ¶ 9:210.

[6] <u>United States v. Redwood City</u>, 640 F.2d 963, 966 (9th Cir. 1981).

1  alternatively, Robert and Barbara Miller are now personally liable for making good on their pledge

2  to Seabury Hall in the amount of $200,000.00.

3       Finally, Federal Rule of Civil Procedure 15(a) states, with respect to amended pleadings

4  requiring leave of court, that such leave "shall be freely given when justice so requires."  The

5  practical effect of such a liberal amendment policy is that, if the court is inclined to grant a motion

6  under Rule 12(b)(6), leave to amend is almost always granted.[7]  Therefore, if this Court is inclined

7  to grant any part of the instant Motion, Plaintiffs request that leave to amend their Complaint be

8  granted to that same extent.

9  ## B.    Plaintiffs Have Stated A Good Claim For Breach of Contract.

10      As stated in the Introduction, the facts of this case can be boiled down very simply as

11  follows: (1) the Defendants made promises to pay money to charities of the Plaintiffs' choice; (2)

12  the Defendants *acted on those promises*; (3) is no doing, Plaintiffs *relied on those promises*; (4) the

13  Defendants failed to follow through on those promises.  As accurately stated by Greensprings in

14  its moving papers:

15  > Under the doctrine of promissory estoppel, a promisor is bound by the
    > promise if he or she should reasonably expect a substantial change of
16  > position in reliance on the promise and injustice can be avoided only
    > by its enforcement.  *Smith v. City and County of San Francisco, 225*
17  > *Cal.App.3d 38, 48 (1990).*  The promisor may be bound to perform the
    > promise despite lack of consideration because "the estoppel is a
18  > substitute for consideration." 1 Witkin, Summary of California Law
    > (10th ed. 2005) "Contracts," § 244, at 275.
19
    The Restatement Second of Contracts states the doctrine of promissory estoppel as follows:
20
21  > A promise which the promisor should reasonably expect to induce
    > action or forbearance on the part of the promisee or a third person and
22  > which does induce such action or forbearance is binding if injustice
    > can be avoided only by enforcement of the promise.[8]
23
24  California cases have stated that the required elements to sustain a promissory estoppel cause of

    action are
25
26  > (1) a promise clear and unambiguous in its terms; (2) reliance by the
    > party to whom the promise is made; (3) his reliance must be both
27

28

[7] Allen v. City of Beverly Hills, 911 F.2d 367, 373 (9th Cir. 1990).

[8] Restatement (Second) of Contracts § 90(1).  See also 1 Witkin Summary of California Law § 244 (10th Ed. 2007).

Opposition to Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted

1  reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.[9]

First, a clear and unambiguous promise was not only made by Greensprings, but it was *actually performed* by Greensprings in that it paid the $500,000.00 in question not once, not twice, *but three times*. The first payment (with checks made payable to the wrong entity) was made *nearly three years before the Anderson v. Dillon lawsuit was filed*. Those payments were all in connection with defendants Dillon's, Bohn's and Greensprings' misrepresentations that Dillon was the personal representative of Elsie Turchen's estate and that the gift was to be paid out of the estate. The terms of the contract were that Greensprings would pay $500,000.00 and that the Millers would forbear pursuing any claims that they may have to the Estate of Elsie Turchen, based upon the defendants' representations and performance. Furthermore, Greensprings and Carleton Briggs promised that the Greensprings board would authorize the $500,000.00 payment and make a motion in the Anderson v. Dillon matter to ensure that the $500,000.00 would be paid as directed by the Millers.

Second, Plaintiffs relied in a number of ways on the Defendants' representations and their reliance was foreseeable. Once the representation was made by defendant Dillon and Greensprings that the payment would be made, Plaintiffs had no reason to pursue the matter any further with the estate. In other words, they did not file a Creditor's Claim or other petition in the probate of Elsie Turchen's estate because Plaintiffs believed that they were going to be fully satisfied by having Greensprings pay the $500,000.00 as instructed. Also, the representations by Carleton Briggs were made *during* the pendency of the Anderson v. Dillon litigation. This is absolutely reasonable because, if one believes that his claim is going to be paid in full without any court intervention, it would be a waste of time and money to prepare the papers in order to enforce any claim in court. This is particularly true if it was the Defendants' secret motive to prevent Plaintiffs from investigating what the Defendants were doing in connection with the Estate of Elsie Turchen. Plaintiffs also relied in particular on Defendant Briggs' representations that the money would be paid by *simply returning the $500,000.00 cashier's check to Greensprings*. Since it was a cashier's

---

[9] Laks v. Coast Federal Savings and Loan Ass'n, 60 Cal. App. 3d 885, 890.

1  check, Greensprings could not stop payment on it.  If Carleton Briggs had not represented to

2  Barbara Miller over the phone and in writing that the money would be paid as promised, why would

3  Mrs. Miller return the check?  It stretches the bounds of imagination to think that Barbara Miller

4  would return a currently negotiable check to Greensprings without some assurance that the money

5  would be paid as promised by the Defendants.  This reliance was abundantly reasonable,

6  particularly in light of the Defendants' prior performance of their promise to pay the money as

7  directed by the Plaintiffs.

8          Furthermore, Plaintiffs Robert and Barbara Miller themselves relied on the representations

9  of the Defendants by making an enforceable pledge of $200,000.00 to Seabury Hall.  The pledge

10  to Seabury Hall was to have been paid by Greensprings, which is why the Millers directed that one

11  of three checks be delivered to Seabury Hall.  Again, this pledge was reasonable because there were

12  repeated assurances that the money would be paid as directed by the Millers (not to mention actual

13  performance).  Plaintiffs had no reason to believe that the Defendants would fail to live up to the

14  representations Defendants made that the money would be paid.

15          Third, Plaintiffs were in fact damaged from Greensprings' failure to fulfill its promise to pay

16  the $500,000.00 according to Plaintiffs' instructions.  As discussed above, the intent of the

17  payments was to make gifts on behalf of Anne and Molly Miller.  Therefore, they are the ones

18  entitled to the damages.  In terms of damages "The cases hold that the appropriate remedy lies in

19  the enforcement of the defendant's promise."[10]  Therefore, the proper measure of damages is the

20  $500,000.00 that was to have been paid to the chosen charities on behalf of Anne and Molly Miller.

21          Alternatively, Plaintiffs Robert and Barbara Miller were individually damaged in that they

22  made an enforceable pledge to Seabury Hall (a school in Hawaii that Anne and Molly Miller

23  attended) in the amount of $200,000.00.  As stated in the First Amended Complaint, that pledge

24  is being enforced by Seabury Hall personally against Robert and Barbara Miller.  The pledge, which

25  was to have been fulfilled by Greensprings on behalf of Anne and Molly Miller, is itself

26  enforceable because the $200,000.00 pledge was the final amount needed by Seabury Hall for a

27  particular fundraising campaign.  Following receipt of the pledge, Seabury Hall stopped the

28

[10]Tomerlin v. The Canadian Indemnity Company, 61 Cal.2d 638, 649 (1964).

Opposition to Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted

1    campaign.  As Seabury Hall changed its position in reliance on the pledge from Robert and Barbara

2    Miller, that pledge is itself enforceable under an estoppel theory.[11]

3           In its moving papers, Greensprings attempts to cleverly sidestep the elements that give rise

4    to a promissory estoppel cause of action by arguing that the underlying gift from Elsie Turchen was

5    not a valid gift and, therefore, the promise by Greensprings was not enforceable.  Whether the

6    underlying gift by Elsie Turchen was valid or not is irrelevant to a determination of whether

7    Plaintiffs' promissory estoppel cause of action can withstand a Rule 12(b)(6) motion.  What matters

8    is that all of the elements of a promissory estoppel cause of action are adequately pled, as discussed

9    immediately above: promise, reliance, reasonableness, damages.  Whether or not the underlying

10   claim against the Turchen estate is valid is an issue of fact to be determined by the trier of fact, not

11   an issue to be determined on a 12(b)(6) motion.

12          Furthermore, by paying the $500,000.00, and later demanding that the money be returned

13   in light of the Anderson v. Dillon lawsuit, Greensprings was acknowledging that it was acting on

14   behalf of the Turchen estate *without court appointment and at its own risk*.  Greensprings was also

15   acknowledging that the Plaintiffs' claim to the money had validity.  Otherwise, *why did*

16   *Greensprings pay the money as directed by Plaintiffs?*  The fact that Greensprings paid the money

17   in the first place completely emphasizes the irrelevance of the issue concerning the validity of the

18   underlying gift from Elsie Turchen to Anne and Molly Miller.

19   **Greensprings' Duress Argument Does Not Apply**

20          Greensprings argues in its papers that Barbara Miller wrote a letter on November 14, 2004

21   to Christine Dillon and Don Bohn that threatened an "investigation" of Greensprings' handling of

22   Elsie Turchen's and Ward Anderson's estates.  Greensprings argues that this letter constituted

23   "duress" and, therefore, any agreement established beyond that date is invalid.  This argument fails

24   for two reasons.  First, the letter was written *after* the Defendants first caused two checks totaling

25   $500,000.00 to be issued (in August 2002), and after the Defendants already represented that the

26   money would be paid as directed by the Plaintiffs.  The letter by Barbara Miller was merely an

27   attempt to get the Defendants to make the $500,000.00 checks out to the right payee.

28
_____

[11] See 1 Witkin Summary of California Law § 253 (10th Ed. 2005, 2007).

Second, the letter cannot be reasonably considered "duress" or "menace" under the definition stated in the moving papers by Greensprings.  There was no threat of criminal action, threat of injury or threat of injury to the character of a person.  All the letter did was to suggest that, if new checks were not issued, the Millers would try to find out why.  This case is completely unlike the Merchants' Collection Agency case, cited by Greensprings, where an agreement was invalidated because of a threat of an embezzlement criminal prosecution.  There was no such threat here, but merely a desire to find out why the Defendants were acting differently than they did when the first checks were issued.

What is important about the letter from Barbara Miller, and Greensprings' reaction to it in its moving papers, is that it reveals the Defendants' secret motivation for making the $500,000.00 payments in the first place. *The Defendants, and Greensprings in particular, did not want anyone to know what they were doing internally and in connection with the estates of Elsie Turchen and Ward Anderson*.  Otherwise, why would the Defendants be so willing to deliver checks to the Plaintiffs as the Millers directed?  More importantly, *why did Greensprings pay the money in the first place?*  In the end, this reaction to Barbara Miller's letter demonstrates that the Plaintiffs' reliance on the Defendants' representations of imminent payment were reasonable because Greensprings was buying the Plaintiffs' silence.  To the Defendants, that silence was obviously worth something.  If it was not worth anything, no money would have been paid at all.

**Greensprings' Illegality Argument Misstates the Law**

Greensprings has also cleverly attempted to convince the Court that any agreement between Greensprings and Plaintiffs is illegal.  Greensprings' argument essentially boils down to the assertion that if there was, in fact, an agreement between it and Plaintiffs, it is illegal and void because the existence of such a contract would jeopardize Greensprings' tax-exempt status.  Generally, a contract is illegal and void if it is

      1. Contrary to an express provision of law;

      2. Contrary to the policy of express law, though not expressly prohibited; or,

3. Otherwise contrary to good morals.[12]

Where the contract is found to be illegal, the general rule is that the contract is void.[13]  There is an exception to this rule which states:

> In situations in which no strong objections of public policy are present, a party to the illegal agreement may be permitted to enforce it, often on the ground that the parties are not *in pari delicto* [not in equal wrong]. Other reasons that have been assigned, either singly, or together are: (1) the violation of law did not involve serious moral turpitude; (2) the adverse party would be unjustly enriched if enforcement were denied; (3) the forfeiture would be disproportionately harsh in proportion to the extent of illegality.[14]

In this case, no strong public policy is implicated by this contract.  Assuming for the sake of argument that the contract Plaintiffs allege is contrary to the provisions of the Internal Revenue Code, the only consequence of that illegality would be that Greensprings could lose its tax-exempt status and be required to report and pay income tax.  There is no moral or ethical component to this contract – *it is simply about money*.  Furthermore, if the contract is illegal, the only illegal act is Greensprings' act in paying the money.  Plaintiffs are completely innocent when it comes to violating any Internal Revenue statute.  It would be unjust to not enforce the contract where the only possible consequence of violating the statute is Greensprings' loss of tax-exempt status.  To do so would reward Greensprings and deprive Plaintiffs of the benefits of Greensprings' promises.  In addition, there is no moral turpitude involved in the performance of this contract.  Quite the opposite, if the contract is enforced, the money will be going to charity.  While there will be no unjust enrichment to any party if the contract is enforced, the forfeiture suffered by Plaintiffs would be disproportionately harsh (to the tune of $200,000.00 to $500,000.00) if the agreement is not enforced.  The argument by Greensprings that the Plaintiffs' alleged contract is illegal is simply a way for Greensprings to hide behind the Internal Revenue statutes and avoid a promise it made *and performed three times*.

Finally, the moving papers suggest a rule that is not legally tenable.  The suggestion raised

---

[12]Cal. Civil Code § 1667.  See also 1 Witkin Summary of California Law Contracts § 451 (10th Ed. 2007).

[13]1 Witkin Summary of California Law Contracts § 440 (10th Ed. 2007).

[14]Id. at § 441.

1  by Greensprings is that, because it is a tax-exempt organization, it is not liable for damages for

2  breach of contract.  Worse yet, the argument also is that Greensprings is not liable for damages for

3  making fraudulent representations because it is a tax-exempt organization.  This logic does not

4  make sense.  The mere fact that the Internal Revenue Service granted Greensprings tax-exempt

5  status does not insulate it from common law contract and tort liabilities.  If it is ultimately proved

6  at trial that Greensprings made fraudulent statements or breached an agreement between it and

7  Plaintiffs, Greensprings would be liable for damages notwithstanding its tax-exempt status.

8           **C.      The First Amended Complaint Is Not Time-Barred.**

9           Greensprings argues that the Plaintiffs' First Amended Complaint is time barred pursuant

10  to Code of Civil Procedure section 339.  Greensprings suggests that both the Complaint and First

11  Amended Complaint are barred because they were filed more than two years after August 11, 2005,

12  the date that Carleton Briggs represented to Barbara Miller that the money would be paid after she

13  returned the final certified check to Greensprings and after he filed a motion in the <u>Anderson v.</u>

14  <u>Dillon</u> litigation authorizing the release of the $500,000.00.   Greensprings is wrong in its

15  application of the law.  A breach of oral contract action only begins to accrue when the agreement

16  is *breached*, not when it was reconfirmed.[15]  In this case, since there was never a motion filed in

17  the <u>Anderson v. Dillon</u> matter, the statute of limitations on this breach of contract claim, if it even

18  applies, did not accrue until August 15, 2007 *at the earliest*, the date that the <u>Anderson v. Dillon</u>

19  matter was dismissed and the date after which Greensprings could no longer file such a motion.

20  This accrual period would run not only for the original Plaintiffs named in the original Complaint,

21  but also for Robert and Barbara Miller in their individual capacities in the First Amended

22  Complaint and in connection with their $200,000.00 pledge to Seabury Hall.

23          **D.      Plaintiffs Have Standing To Sue.**

24          It is black-letter law that parties to an agreement have standing to sue when that agreement

25  is breached.  Greensprings, however, argues that Plaintiffs do not have standing to sue in this case

26  because Plaintiff cannot prove damages.  Whether or not damages can be proved is a matter for trial

27

28          [15]<u>Romano v. Rockwell Int'l, Inc.</u> (1996) 14 Cal.4th 479, 488; <u>Niles v. Louis H. Rapoport & Sons, Inc.</u> (1942) 53 Cal.
App. 2d 644, 651.

and is not the correct inquiry for a motion under Federal Rule 12(b)(6). The appropriate question for the Court to resolve at this stage is whether the Plaintiffs have adequately stated causes of action in their First Amended Complaint. In this case, Plaintiffs have demonstrated in their First Amended Complaint that they have standing to sue on all of their causes of action.

Standing in federal court requires allegations in the complaint of (1) injury in fact; (2) causation; and (3) redressability.[16] The Motion alleges that there is one fatal defect: that Plaintiffs cannot prove damages ("injury in fact"). To the contrary, each and every cause of action of the First Amended Complaint satisfies these requirements. The First Amended Complaint alleges that the Defendants represented to the Plaintiffs that they would pay the $500,000.00 to the charities of the Millers' choice *on behalf of Anne and Molly Miller*. Since this money was represented to the Plaintiffs that the payment would be made on the Millers' behalf, it is the Millers who were injured as all of the Defendants acknowledged that Elsie Turchen wanted to give them a gift, a gift that the Defendants agreed to fulfill. Furthermore, Robert and Barbara Miller were also injured in fact in that they made an enforceable pledge to Seabury Hall for $200,000.00 in reliance on the representations and actions of the Defendants that the money would be paid as directed by the Millers. The causation and redressability requirements are also met in that the Defendants failed to live up to their promise and a favorable judgment would adequately redress the wrong committed by Defendants.

### E.    Plaintiffs Can Recover Damages For Conversion.

Conversion is the wrongful exercise of dominion over personal property of another.[17] Historically, conversion was limited to the wrongful taking of tangible personal property. However, money can be the subject of a conversion action where a specific, identifiable sum is involved.[18]

In this case, a claim is stated against Greensprings for conversion. As discussed above, the

---

[16]Lujan v. Defenders of Wildlife (1992) 504 U.S. 555, 560-561.

[17]Steele v. Marsicano, 102 Cal. 666, 669 (1894). See also 5 Witkin Summary of California Law Torts § 699 (10th Ed. 2007).

[18]Haigler v. Donnelly, 18 Cal.2d 674, 681 (1941). See also 5 Witkin Summary of California Law Torts § 703 (10th Ed. 2007).

1    agreement was for Greensprings to pay $500,000.00 to a charity or charities on behalf of Anne and

2    Molly Miller.  Once Greensprings delivered a $500,000.00 cashier's check to Barbara Miller in

3    performance of that agreement, Greensprings lost the legal ability to take that check back.

4    *Greensprings could not even stop payment on that check.*  It was only by falsely representing to

5    Barbara Miller that a motion would be made to the San Mateo County Superior Court for payment

6    of that money back to the Millers was Greensprings able to regain possession of the cashier's check.

7    Certainly, the Millers did not *want* to give Greensprings the check back (otherwise there would be

8    no lawsuit), but it was only given back with assurances that it would be paid with all possible haste.

9    Under these facts as disclosed in the Complaint, a conversion cause of action is properly pled.

10    **F.    The First Amended Complaint States A Valid Cause Of Action For Fraud.**

11        Greensprings alleges that Plaintiffs cannot sustain their Fraud cause of action because they

12    cannot prove damages.  Plaintiff's damages exist because the payment from Greensprings to the

13    charities were to be made *on behalf of Anne and Molly Miller*.  Recall that the money was always

14    intended to take the place of the gift intended to be given by Elsie Turchen.  Once Greensprings

15    began making the $500,000.00 payments, it confirmed that Anne and Molly were entitled not only

16    to the money, but also to direct Greensprings how to pay it.  By making the fraudulent

17    representations as alleged in the Complaint, Greensprings deprived Plaintiffs of the right not only

18    of possession of the money, but also to direct how that money is to be paid.  Therefore, the damages

19    incurred by Plaintiffs as a result of Greensprings' fraudulent conduct is the $500,000.00 itself.

20    Furthermore, Robert and Barbara Miller were also injured in that they made an enforceable pledge

21    to Seabury Hall for $200,000.00 in reliance on the representations and actions of the Defendants

22    that the money would be paid as directed by the Millers.

23        Greensprings also alleges that there is no fraud because it did perform on the representations

24    it made to pay the money as directed by the Millers.  The performance that Greensprings alludes

25    to is the checks that it issued to the wrong entity (which could, therefore, not be negotiated) and the

26    cashier's check to Maui Preparatory Academy  that Greensprings and Carleton Briggs demanded

27    be returned, with the representation that a motion would be filed in the <u>Anderson v. Dillon</u> matter

28    for the money to be released.  At best, Defendants *attempted* to perform and, ultimately, failed to

1   perform when it did not make good on its representation that the money would be forthcoming via

2   the Anderson v. Dillon litigation. Defendants' obligation continued the moment that Barbara Miller

3   returned the $500,000.00 cashier's check to Greensprings based on Carleton Briggs'

4   representations that the money was forthcoming.

5       Furthermore, Greensprings argues that the "conspiracy" claim to defraud the Elsie Turchen

6   estate is *res judicata* because that matter was settled in the Anderson v. Dillon litigation. This

7   argument has no support whatsoever. In order for the issue to be *res judicata* so as to preclude

8   Plaintiff's claim, (1) the prior action must have resulted in a final judgment on the merits; (2) the

9   present action must be on the same cause of action as the prior action; and (3) there must be privity

10  between the parties to the prior action and the present action.[19]  In this case, Plaintiffs were not

11  parties to the Anderson v. Dillon lawsuit, nor were they in privity with the parties in that lawsuit.

12  Therefore, while the dismissal would have preclusive effect as to Penny Anderson and the other

13  plaintiffs in that lawsuit, it does not have preclusive effect on the Plaintiffs herein.

14      ## G.    Plaintiffs Have Sufficiently Pled A Declaratory Relief Cause of Action

15      California Code of Civil Procedure section 1060 allows

16          Any person interested under a written instrument, excluding a will or
17          trust, or under a contract, or who desires a declaration of his or her
            rights or duties with respect to another, or in respect to, in, over or
18          upon property, or with respect to the location of the natural channel of
            a watercourse.

19  to seek a judicial declaration of his or her rights in the contract. Federal law is similar. Under both

20  California and Federal law, an the Complaint must contain an allegation of the existence of an

21  "actual controversy."

22      Here, Greensprings alleges that there is no "actual controversy" as to who the $500,000.00

23  belongs to. As discussed several times above, the actual controversy arose when Greensprings paid

24  the $500,000.00 three times on behalf of Anne and Molly, made the representation that the money

25  would be paid with all due haste after the third check was returned, and no payment was ever made.

26  Plaintiffs assert that once the money was paid, the agreement was confirmed by Greensprings and

27  Plaintiffs had the right to decide what to do with the money because it belonged to them.

28

[19] Busick v. Workmen's Comp. Appeals Bd. (1972) 7 Cal.3d 967, 974.

Opposition to Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted

1   Greensprings disagrees with this assertion.  This is the actual controversy.  The Complaint

2   sufficiently pleads a Declaratory Relief action.

3          **H.    Imposition of a Constructive Trust is Appropriately Pled**

4          Plaintiffs' complaint seeks the imposition of a constructive trust as a result of Greensprings'

5   actions in failing to pay the $500,000.00 as demanded by the Millers.  One who wrongfully detains

6   a thing[20] or gains a thing by "fraud, accident, mistake, undue influence, violation of a trust, or other

7   wrongful act"[21] is an involuntary trustee of the thing gained, for the benefit of the person who would

8   otherwise have had it.

9              A constructive trust is not a true trust but an equitable remedy available
              to a plaintiff seeking recovery of specific property in a number of
10             widely differing situations.  The cause of action is not based on the
              establishment of a trust, but consists of the fraud, breach of fiduciary
11             duty, or other act which entitles the plaintiff to some relief.  That relief,
              in a proper case, may be to make the defendant a constructive trustee
12             with a duty to transfer to the plaintiff.[22]

13         Plaintiffs have clearly pleaded facts which state a cause of action for the imposition of a

14   constructive trust because they have alleged that Greensprings has wrongfully retained assets

15   (specifically $500,000.00) of Anne and Molly Miller.  These assets are Anne and Molly Miller's by

16   virtue of Greensprings' payments to the chosen charities as directed by the Millers as a substitute

17   for Elsie Turchen's intended gift to them.  Greensprings' motion is not well taken on this point and

18   should be denied.

19         **I.    Specific Performance Is Adequately Pled.**

20         The specific performance cause of action is relatively simple.  Plaintiffs allege that (1)

21   Defendants made representations that they would pay $500,000.00 to charities of the Millers'

22   choice; (2) Plaintiffs relied on these representations by foregoing any claim against the Estate of

23   Elsie Turchen and, in the case of Robert and Barbara Miller, by making an enforceable pledge to

24   Seabury Hall in the amount of $200,000.00; (3) Defendants failed to perform, ultimately by

25   Greensprings' failure to file any motion for payment of the money in the <u>Anderson v. Dillon</u> matter

26         [20]Calif. Civil Code § 2223.

27         [21]Calif. Civil Code § 2224.

28         [22]<u>Olson v. Toy</u> (1996) 46 Cal.App.4th 818, 823.

1  or to otherwise cause the money to be paid; (4) Plaintiffs have no other remedy from the Turchen

2  estate because the statute of limitations has run on claims against the estate and the <u>Anderson v.</u>

3  <u>Dillon</u> matter was dismissed with prejudice.  The Defendants are directly responsible for the

4  Plaintiffs' inability to file a claim in the probate proceeding or participate in the <u>Anderson v. Dillon</u>

5  matter because of their false representations that the money would be paid.  If the money was

6  forthcoming, there was no reason for Plaintiffs to make any claim.  Because Plaintiffs believed

7  Defendants, they now have no way to enforce the promise other than through the instant lawsuit.

8  **J.    Interference With Right To Inherit Is Adequately Pled.**

9  The moving papers seem to suggest that the Defendants' relationship with Elsie Turchen was

10  only a brief one, beginning and ending with the transfer of the Belmont Property to Greensprings.

11  That is not what the First Amended Complaint suggests at all.  The First Amended Complaint

12  alleges a long-term relationship between all of the Defendants and Elsie Turchen, resulting in the

13  transfer of many parcels of real property to Greensprings by fraud and/or deceit.  The First

14  Amended Complaint alleges that the fraudulent acts of the Defendants directly and proximately

15  resulted in Elsie Turchen's inability to give a substantial gift to Anne and Molly Miller.  It is those

16  facts that adequately plead the Interference With Right to Inherit causes of action.

17

18  **IV.**

19  **CONCLUSION**

20  For the foregoing reasons, Plaintiffs' First Amended Complaint states valid causes of action

21  in all respects.  Therefore, Greensprings' Motion to Dismiss pursuant to Federal Rule of Civil

22  Procedure 12(b)(6) should be denied.  Alternatively, if the court is inclined to grant any part of

23  Greensprings' motion, Plaintiffs request that they be granted leave to amend their Complaint.

24  Dated: May 14, 2008                                   TEMMERMAN & CILLEY, LLP

25

26                                          By:    _____/s/_____

27                                                 JAMES P. CILLEY, ESQ.
                                                   MARK SCHMUCK, ESQ.
28                                                 Attorneys for Plaintiffs